834 F.2d 1238
 Daniel MELANCON, et al., Plaintiffs,
v.
AMOCO PRODUCTION CO., etc., Defendant-Appellant,
v.
BERAUD ENTERPRISES, INC., Third Party Defendant-Appellee.
Daniel MELANCON and Tressella Aymond Melancon, Plaintiffs-Appellants,
and
American General Fire & Casualty, Co., Intervenor-Appellant,
v.
AMOCO PRODUCTION CO., Defendant-Appellee.
 Nos. 86-4491, 86-4859.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 6, 1988.
As Amended on Denial of Rehearing March 22, 1988.*
 
 Jacque B. Pucheu, Pucheu & Pucheu, Eunice, La., for plaintiffs-appellants.
 Edward J. Marquet, Juneau, Hill, Judice, Marquet, Hill & Adley, Lafayette, La., for American General Fire & Cas. Co.
 John O. Charrier, Jr., Patrick H. Patrick, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for Amoco Production Co.
 Richard A. Chopin, Metairie, La., for Beraud Enterprises.
 Appeals from the United States District Court for the Western District of Louisiana.
 Before REAVLEY, WILLIAMS and HIGGINBOTHAM, Circuit Judges.
 JERRE S. WILLIAMS, Circuit Judge:
 
 
 1
 Appellants Daniel Melancon and his wife, Tressella Aymond Melancon, sued Amoco Production Company claiming damages based upon Daniel Melancon's work related injury. Appellant, American General Fire & Casualty Company, intervened. The district court dismissed the suit on the basis of its finding that Mr. Melancon was a "borrowed employee" of Amoco, and therefore the suit against Amoco was barred by the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. Sec. 905(a). The Melancons and the intervenor insurance company appeal. We affirm the district court.
 
 
 2
 Amoco Production Company appeals the district court's dismissal of its indemnification claims against Beraud Enterprises, Inc. We disagree with the district court that Amoco is not entitled to indemnity from Beraud under the terms of the contract between those two parties. We reverse the district court's dismissal of Amoco's indemnity claim and remand for a determination of Amoco's costs incurred in defending the suit.
 
 I. Factual Background
 
 3
 On August 11, 1984, while on the payroll of Beraud Enterprises, Inc. as a licensed welder, but while working on a platform owned and operated by Amoco Production Company located on the Outer Continental Shelf off the Louisiana coast, Daniel Melancon sustained personal injuries during the course of his work. Melancon alleges he injured his back while carrying a heavy valve at the request of an Amoco employee.
 
 
 4
 Melancon had been with Beraud Enterprises since 1977. Beraud, a Louisiana business, primarily runs a machine shop that does fabrication work for various oil companies. Mr. Melancon, however, had been assigned by Beraud to work offshore as a production welder for Amoco for approximately five years prior to the August 11, 1984, accident. Melancon worked entirely on Amoco's offshore platforms during this five year period except for a six month period in 1980-81 when he worked onshore in Beraud's machine shop, and a period in 1981-82 when he suffered an on the job injury.
 
 
 5
 Melancon worked a seven days on/seven days off shift for Amoco. Melancon was transported to and from the platforms by Amoco along with the Amoco crew,[1] and Melancon stayed in the same bunkhouse and ate the same food as the Amoco crew. Melancon was the only welder on his shift, but another welder, not employed by Beraud, worked during the other seven day shift. Beraud billed Amoco $29 an hour for Melancon's services and from that Beraud paid Melancon $10 an hour. Beraud furnished Melancon a welding machine, a cut torch, and related welding equipment at no additional charge to Amoco.[2] Beraud also furnished Melancon with a helper, but this helper could also be worked as a roustabout with the Amoco crew. Amoco provided all the materials that were to be welded. Melancon provided his own safety equipment (safety toe shoes, his welding hood and cap). Amoco did not regularly make safety equipment available to Melancon although it did provide safety equipment to its employees.
 
 
 6
 Melancon was a production welder (or field maintenance welder) who took most of his orders from Amoco field foreman Dennis LeMaire while working in the Amoco offshore field. Beraud gave Melancon no instructions beyond doing whatever work was required by Amoco. Beraud generally had no contact with Melancon during Melancon's shifts unless something went wrong. Melancon merely reported to Beraud once every two weeks in order to report his hours. Melancon, of course, chose the manner in which to do his welding work according to his professional judgment,[3] but Amoco field foreman LeMaire and other Amoco employees could tell Melancon when to do the welding work and when to do other kinds of work. Melancon was given instructions as to what welding maintenance work to perform during his seven day hitches in the Amoco field by either LeMaire or the pumper in charge of a particular platform.[4] Melancon could determine what types of materials were needed for his welding work and request that Amoco order them. Melancon also supervised several Amoco employees who occasionally were sent to assist him in performing his work. While Amoco could not terminate Melancon's employment with Beraud, Amoco could ask that Melancon be replaced by another welder in the Amoco field.
 
 
 7
 When there was no welding work to be done, Melancon did any other work that was assigned to him by the field foreman or the pumpers, including cooking dinner. This nonwelding work accounted for about 20% of Melancon's time. Amoco paid Beraud, and Beraud in turn paid Melancon, the same hourly welder's rate regardless of what type of work Melancon performed.
 
 
 8
 There was a "Well and Lease Service Master Contract" between Amoco and Beraud, purportedly covering the terms and conditions of Melancon's work for Beraud on Amoco's platforms. This contract apparently was entered into on July 26, 1983. Provision 6 of this contract says essentially that no employee of Beraud is to be deemed for any purpose the agent, servant, or representative of Amoco.[5] Provision 10 of the contract apparently requires Beraud to defend, indemnify, and hold Amoco harmless from and against any and all losses, costs, expenses and causes of action, including attorney's fees and court costs, for injuries to and death of Beraud's employees, including those that arise out of Amoco's negligence.[6] Provision 11 requires Beraud to secure and maintain various types of insurance, including worker's compensation, during the term of the contract.[7] Finally, the contract obligates Beraud to perform all jobs with due diligence and in a good and workmanlike manner.[8]
 
 II. Proceedings in the District Court
 
 9
 Melancon and his wife filed suit in federal district court in Louisiana against Amoco as owner of the platform for his injuries arising from the August 11, 1984, incident. Beraud Enterprises was not named as a defendant in the Melancons' complaint. The Melancons alleged Amoco's negligence and/or legal fault was the sole cause of Mr. Melancon's injuries. Amoco answered, denying any liability to the Melancons.
 
 
 10
 Amoco then filed a third party complaint against Beraud Enterprises seeking tort and contractual indemnity for any damages the Melancons might recover from Amoco and for Amoco's costs of defending itself. Amoco sought indemnity under the terms of Provision 10 of its contract with Beraud, on the basis of an active/passive theory of tort indemnity, and based on an alleged breach by Beraud of the express warranty of workmanlike performance in the Amoco-Beraud Contract or an alleged implied warranty of workmanlike performance.
 
 
 11
 Beraud filed a motion for summary judgment seeking dismissal of Amoco's third party indemnity claims against it. The district court granted Beraud's motion for summary judgment and entered final judgment under Federal Rule of Civil Procedure 54(b) in Beraud's favor on June 12, 1986. The district court held that neither express contractual nor tort indemnity was owed to Amoco by Beraud, and that Amoco could not seek indemnity from Beraud on a theory of implied warranty under Louisiana law nor under any express warranty of workmanlike performance in the contract. The district court held that the Louisiana Oilfield Indemnity Act expressly precluded some of Amoco's indemnity claims against Beraud. Amoco appeals this holding.
 
 
 12
 The Melancons' case against Amoco was tried on October 1, 1986, by the district court without a jury. Beraud's worker's compensation carrier, American General Fire & Casualty, had earlier intervened to recover both the medical and weekly compensation benefits it had paid Melancon prior to and through the date of the trial, pursuant to the Longshoremen and Harbor Workers' Compensation Act, 33 U.S.C. Sec. 901 et seq. The district court heard all the evidence on the "borrowed employee" issue, and on November 3, 1986, issued oral findings holding that Mr. Melancon had been a "borrowed employee" of Amoco, and his exclusive remedy against Amoco for his injuries was the LHWCA benefits. Amoco moved for involuntary dismissal based upon this holding. The district court granted Amoco's motion and dismissed the Melancons' suit against Amoco. The Melancons and American General appeal the district court's finding of "borrowed employee" status.
 
 
 13
 III. Was Daniel Melancon a "Borrowed Employee" of Amoco?
 
 
 14
 All the parties agreed that the question of Mr. Melancon's status as a "borrowed employee" of Amoco constituted a threshold issue for the Melancons' recovery from Amoco. If Mr. Melancon was found to be the "borrowed employee" of Amoco, he was covered by the LHWCA, entitling him to worker's compensation under this Act. Worker's compensation under the LHWCA is the exclusive remedy for an employee against his employer because the Act bars all common law tort actions against the employer, and Amoco was the employer if Melancon was Amoco's "borrowed employee."[9] Alday v. Patterson Truck Line, Inc., 750 F.2d 375 (5th Cir.1985); Hebron v. Union Oil Co. of California, 634 F.2d 245, 248 (5th Cir.1981); Gaudet v. Exxon Corp., 562 F.2d 351, 356 (5th Cir.1977), cert. denied, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978).[10]
 
 
 15
 "[T]he issue of whether a relationship of borrowed servant existed is a matter of law" for the district court to determine. Gaudet v. Exxon, 562 F.2d at 357; Ruiz v. Shell Oil Co., 413 F.2d at 314. See also Capps v. N.L. Baroid-NL Industries, Inc., 784 F.2d 615, 617 (5th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 141, 93 L.Ed.2d 83 (1986). There are, however, nine separate factual inquiries underlying "borrowed employee" status. In its analysis, the district court considered all nine factors and found the evidence clearly indicating "borrowed employee" status on all but one. On this one factor,[11] the district court found the evidence weighed in favor of "borrowed employee" status or at least was a draw. Thus, the court decided the issue of borrowed employee after full trial.
 
 
 16
 We do not upset a district court's factual findings unless they are clearly erroneous. In Ruiz v. Shell Oil, this Court suggested the nine factors to be evaluated in determining whether the "borrowed employee" doctrine applies:
 
 
 17
 (1) Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?
 
 
 18
 (2) Whose work is being performed?
 
 
 19
 (3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?
 
 
 20
 (4) Did the employee acquiesce in the new work situation?
 
 
 21
 (5) Did the original employer terminate his relationship with the employee?
 
 
 22
 (6) Who furnished tools and place for performance?
 
 
 23
 (7) Was the new employment over a considerable length of time?
 
 
 24
 (8) Who had the right to discharge the employee?
 
 
 25
 (9) Who had the obligation to pay the employee?
 
 
 26
 See also Capps v. N.L. Baroid-NL Industries, Inc., 784 F.2d at 616-17; West v. Kerr-McGee Corp., 765 F.2d 526, 530 (5th Cir.1985); Alday v. Patterson Truck Line, Inc., 750 F.2d at 376; Hall v. Diamond M Co., 732 F.2d at 1249; Gaudet v. Exxon, 562 F.2d at 355.
 
 
 27
 The first factor, the question of who has control over the employee and the work he is performing, has been considered the central issue of "borrowed employee" status in some of our cases, e.g. Hebron v. Union Oil Co., 634 F.2d at 247,[12] although not necessarily determinative. In the case at bar, Amoco clearly had control over Melancon and his work: Melancon took orders only from Amoco personnel who told him what work to do, and when and where to do it. Beraud gave no instructions to Melancon except to go to the Amoco field and perform the work requested by Amoco personnel. The fact that Melancon had specialized welding skills he utilized in most of his work and none of the Amoco personnel had similar welding expertise does not bar a finding of "borrowed employee" status. Huff v. Marine Tank Testing Corp., 631 F.2d 1140 (4th Cir.1980).
 
 
 28
 As to the second factor, there can be no doubt that Amoco's work was being performed by Melancon. Melancon's work assisted Amoco in the production of hydrocarbons by maintaining the production equipment and platforms in the Amoco field. It is irrelevant that Melancon's primary job was welding, which was an essential, although only incidental, aspect of Amoco's business.
 
 
 29
 The third factor, whether there was an agreement, understanding, or meeting of the minds between Beraud, the original employer, and Amoco, the borrowing employer, is a closer question. Provision 6 of the "Well and Lease Service Master Contract" does specify that no Beraud employee is to be considered the agent, servant, or representative of Amoco. The reality at the worksite and the parties' actions in carrying out a contract, however, can impliedly modify, alter, or waive express contract provisions. McDonough Marine Service, Inc. v. M/V ROYAL STREET, 465 F.Supp. 928, 935 (E.D.La.1979), aff'd 608 F.2d 203 (5th Cir.1979); Stauffer Chemical Co. v. W.D. Brunson, 380 F.2d 174, 182 (5th Cir.1967). In the case at bar, Beraud clearly understood that Melancon would be taking his instructions from Amoco, notwithstanding Provision 6 of the contract. Obviously parties to a contract cannot automatically prevent a legal status like "borrowed employee" from arising merely by saying in a provision in their contract that it cannot arise. We agree with the district court that there was an understanding between Beraud and Amoco sufficient to satisfy this factor.[13]
 
 
 30
 Melancon clearly acquiesced in his new work situation, the fourth factor under Ruiz. He knew when he began to work on Amoco's offshore platforms in 1977 what his work conditions would be, and he made no complaint regarding these conditions to Beraud or to Amoco.
 
 
 31
 The district court was not in error in finding that Beraud had, in effect, ceased control in its relationship with Melancon. This factor does not require a lending employer to sever completely its relationship with the employee, because such a requirement would effectively eliminate the "borrowed employee" doctrine. Capps v. N.L. Baroid-NL Industries, 784 F.2d at 617-18. "The emphasis when considering this factor should focus on the lending employer's relationship with the employee while the borrowing occurs." Id. Beraud's control over Melancon was nominal at most while Melancon worked for Amoco.
 
 
 32
 The factor asking who furnished the tools and the place of performance gave the district court some reason for concern. Beraud furnished Melancon his welding machine and related equipment, while Amoco furnished certain consumables, the place of performance, transportation to and from the place of work, food, lodging, etc. We have no problem in agreeing with the district court that the balance on this factor is in Amoco's favor.
 
 
 33
 The three remaining factors need only be mentioned briefly. Clearly the employment of Melancon by Amoco was over a considerable length of time. Melancon had worked primarily for Amoco for the seven years while he was with Beraud Enterprises prior to the accident. Amoco also had the right to discharge Melancon even though Amoco could not terminate Melancon's employment with Beraud. Amoco's right to terminate Melancon's services in the Amoco field satisfied this requirement. Capps v. N.L. Baroid-NL Industries, Inc., 784 F.2d at 618, Hebron v. Union Oil Co., 634 F.2d at 247. Finally, we agree the district court was correct in finding that Amoco paid Melancon's wages via Beraud based on the number of hours Melancon worked for Amoco. The fact that Beraud kept a percentage of the amount Amoco was charged is not relevant. Amoco furnished the funds from which Beraud paid Melancon, and this is the determinative inquiry for this factor. Capps v. N.L. Baroid-NL Industries, Inc., 784 F.2d at 618.
 
 
 34
 The summary is that the district court conducted a thorough "borrowed employee" status analysis under the nine factor Ruiz test. It was not clearly erroneous in any of its factual findings, and it correctly concluded that Melancon was Amoco's "borrowed employee" for LHWCA purposes.
 
 
 35
 IV. Does LHWCA Sec. 905(a), as Amended in 1984, Preclude Mr. Melancon from Being a "Borrowed Employee" of Amoco?
 
 
 36
 The Melancons also argue that Amoco can be considered Melancon's employer, responsible for his worker's compensation under LHWCA Sec. 904(a) and thus shielded from tort liability under LHWCA Sec. 905(a), only if Melancon's nominal employer, Beraud, had failed to secure Melancon's worker's compensation coverage and Amoco did secure compensation coverage. They claim the 1984 amendments to Sec. 904(a)[14] and to Sec. 905(a)[15] allow a "borrowing employer" to utilize the tort immunity of Sec. 905(a) only if the nominal employer failed to provide for worker's compensation for the "borrowed employee," and the "borrowing employer" did in fact secure the worker's compensation insurance instead. They claim this did not happen here since Beraud secured Mr. Melancon's worker's compensation insurance through American General. See Doucet v. Gulf Oil Corp., 783 F.2d 518, 522 (5th Cir.1986).
 
 
 37
 We rejected this argument in West v. Kerr-McGee, supra, and in subsequent cases have continued to follow this holding. Alexander v. Chevron, U.S.A., 806 F.2d 526 (5th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987); Capps v. N.L. Baroid-NL Industries, Inc., supra; Doucet v. Gulf Oil Corp., supra. These cases hold that the 1984 amendments to LHWCA Secs. 904(a) and 905(a) do not restrict "borrowed employee" status only to instances when the lending employer fails to secure worker's compensation coverage and the borrowing employer does. The cases continue to apply the Kerr-McGee rule on the "borrowed employee" doctrine as it relates to the LHWCA and tort immunity under the LHWCA. The Kerr-McGee opinion carefully explains what these 1984 amendments were meant to accomplish. 765 F.2d at 528-30.[16] Thus, the law is clear that the 1984 amendments did not affect the established "borrowed employee" analysis.[17]
 
 V. Amoco's Indemnity Claims Against Beraud
 
 38
 Because the Melancons' suit against Amoco is barred by LHWCA Sec. 905(a) under the "borrowed employee" doctrine, Amoco is not liable to the Melancons for any damages for Mr. Melancon's injuries. As a result, the only claim Amoco now can assert against Beraud under Amoco's various indemnity theories is for the expense Amoco incurred in defending against the Melancon suit (attorney's fees, costs of defense, and related expenses).
 
 
 39
 We disagree with the district court that Amoco is not entitled to indemnity from Beraud under the terms of Provision 10 of its contract with Beraud. Although the issue of indemnity is controlled by Louisiana law,[18] the Louisiana Oilfield Indemnity Act, La.Rev.Stat.Ann. Sec. 9:2780, does not invalidate Amoco's indemnity claim based on this express indemnity provision in the Amoco-Beraud contract. The Louisiana Oilfield Indemnity Act invalidates "any provision in any agreement which requires defense and/or indemnification, for death or bodily injury to persons, where there is negligence or fault (strict liability) on the part of the indemnitee...." Sec. 9:2780(A). In the case at bar, the Melancons alleged that the negligence and/or legal fault of the indemnitee, Amoco, caused Mr. Melancon's injuries. However, the Louisiana Supreme Court has held after certification from this Court that under the Louisiana Oilfield Indemnity Act "[t]he allegations of the plaintiff's suit against the indemnitee are irrelevant to the indemnitor's obligation to pay. Rather it is the terms of the indemnity agreement which govern the obligations of the parties." Meloy v. Conoco, Inc., 817 F.2d 275, 280 (5th Cir.1987). Here there exists no holding that Amoco was negligent or at fault for Mr. Melancon's injuries. The case never reached the issue of Amoco's negligence because of the LHWCA's bar. For that reason Amoco is entitled to indemnity from Beraud for the costs of its defense. Provision 10 of the Amoco-Beraud contract so provides, and the Louisiana Oilfield Indemnity Act does not apply absent a finding of negligence or fault against Amoco.
 
 
 40
 Because we find that Amoco is entitled to indemnity from Beraud for the costs of its defense under Provision 10 of its contract with Beraud, we decline to explore Amoco's other theories of indemnity. Amoco is not entitled to the costs incurred in establishing its indemnity claim against Beraud. "[T]he indemnitee may not recover those costs and expenses incurred simply establishing the indemnities [sic] right to indemnification from the indemnitors." State v. Laconco, Inc., 430 So.2d 1376, 1385 (La.App. 1 Cir. 1983); see also Dow Chemical Co. v. M/V ROBERTA TABOR, 815 F.2d 1037, 1046 (5th Cir. 1987). We remand to the district court for determination of Amoco's expenses in defending against the Melancon suit.
 
 VI. Conclusion
 
 41
 The district court was correct in holding that Mr. Melancon was Amoco's "borrowed employee" thus barring the Melancons' suit against Amoco under the LHWCA, 33 U.S.C. Sec. 905(a). The district court, however, erred in granting Beraud's motion for summary judgment on Amoco's third party indemnity action. Amoco is entitled to be indemnified by Beraud for the costs of its defense of the suit. The case is remanded for entry of judgment in favor of Amoco for such expenses.
 
 
 42
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 
 
 
 *
 The Order amending this opinion is published at 841 F.2d 572
 
 
 [1]
 Melancon, however, usually came back to shore on Wednesday evenings whereas the Amoco crew came back on Thursday mornings
 
 
 [2]
 Beraud also furnished a grinder for which Beraud did charge Amoco separately because the grinder's buffing wheels and grinding blades needed to be replaced often
 
 
 [3]
 Melancon is certified as a licensed plate and pipe welder by the American Federation of Welders, Local 102 of Abbeville, Louisiana. Field foreman LeMaire does not know much about welding himself, and Amoco did not have any welders on its own payroll working this field. LeMaire allowed Melancon to exercise his professional judgment in performing the welding work
 
 
 [4]
 The Amoco field contained 6 or 7 platforms during the time Melancon worked the field
 
 
 [5]
 Provision 6 reads in full:
 
 
 [6]
 Contractor shall be an independent contractor with respect to all work done and services performed hereunder, and neither Contractor nor anyone used or employed by Contractor shall be deemed for any purpose to be the agent, servant, or representative of Amoco in the performance of such work or services or any part thereof, or in any matter dealt with herein, and Amoco shall have no direction or control of Contractor, or its employees and agents, except in the results to be obtained. It is understood that, by this provision, neither party is assuming any liability for the actions or omissions of the other party, except as is stated in this contract. It is agreed, however, that Contractor shall not be liable for damage to property owned by Amoco, unless such damage is caused by the negligence of the Contractor. It being the intent of the parties hereto that his provision shall apply, but not be restricted to subsurface damage and surface damage arising from subsurface damage
 
 
 [6]
 Provision 10 reads in full:
 
 
 [10]
 In order to eliminate controversies between Contractor, its Subcontractors and Amoco and its joint owners, if any, and their respective insurers, Contractor assumes all liability for and hereby agrees to defend, indemnify, and hold Amoco, its joint owner or owners, if any, and their insurers, harmless from and against any and all losses, costs, expenses and causes of action, including attorney's fees and court costs, for injuries to and death of Contractor's and its Subcontractor's employees, arising out of, incident to, or in connection with any and all operations under this contract and whether or not such losses, costs, expenses and causes of action are occasioned by or incident to or the result of the negligence of Amoco, its joint owner or owners, if any, and its agents, representatives and employees. Contractor agrees to insure this assumption of liability. The liability assumed by Contractor pursuant to this clause shall be limited to the amounts carried by Contractor's current liability insurance, but in no event shall it be less than the minimum limits set out in Paragraph 11(b), below
 
 
 [7]
 Provision 11 reads in full:
 
 
 [11]
 As to all operations provided for herein, Contractor shall secure and maintain during the term of this agreement the following insurance:
 (a) Workmen's Compensation Insurance which shall fully comply with the requirements of state laws as well as federal laws, if applicable.
 (b) Comprehensive General Liability Insurance, including Contractual Liability coverage with minimum limits of $100,000 each person and $300,000 each occurrence for Bodily Injury and $100,000 each occurrence for Property Damage.
 (c) Automobile Liability Insurance covering owned, hired, and non-owned vehicles used by Contractor with minimum limits of $100,000 each person and $300,000 each occurrence for Bodily Injury and $100,000 each occurrence for Property Damage.
 If requested by Amoco, Contractor shall furnish Amoco insurance certificates to evidence the insurance required herein. Maintaining the prescribed insurance shall not relieve Contractor of any other obligation under the Agreement.
 
 
 [8]
 Provision 1 of contract:
 
 
 [1]
 Upon Amoco notifying Contractor in the manner provided above of the jobs required to be performed hereunder, Contractor will undertake the same and thereafter carry them on with due diligence and in a good and workmanlike manner to completion, subject, however, to Paragraphs 12 and 13 hereof
 
 
 [9]
 LHWCA, 33 U.S.C. Sec. 905(a) reads:
 (a) Employer liability; failure of employer to secure payment of compensation
 The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death, except that if an employer fails to secure payment of compensation as required by this chapter, an injured employee, or his legal representative in case death results from the injury, may elect to claim compensation under the chapter, or to maintain an action at law or in admiralty for damages on account of such injury or death. In such action the defendant may not plead as a defense that the injury was caused by the negligence of a fellow servant, or that the employee assumed the risk of his employment, or that the injury was due to the contributory negligence of the employee. For purposes of this subsection, a contractor shall be deemed the employer of a subcontractor's employees only if the subcontractor fails to secure the payment of compensation as required by section 904 of this title.
 
 
 [10]
 The "borrowed employee" doctrine was initially recognized by the Supreme Court in Standard Oil v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480 (1909). The doctrine was established to hold a borrowing employer liable under respondeat superior for the negligence of any employee he had borrowed. Only beginning with Ruiz v. Shell Oil Co., 413 F.2d 310 (5th Cir.1969), did this Circuit borrow the "borrowed employee" doctrine to give borrowing employers a shield from tort liability from their borrowed employees under LHWCA. Gaudet v. Exxon Corp., 562 F.2d at 355-56. See also Doucet v. Gulf Oil Corp., 783 F.2d 518, 522 (5th Cir.1986), cert. denied, sub nom Gulf Oil Corp. v. Danos & Curole Marine Contractors, Inc., --- U.S. ----, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986); Hall v. Diamond M Co., 732 F.2d 1246 (5th Cir.1984) (" 'The borrowed servant doctrine is the functional rule that places the risk of a worker's injury on his actual rather than his nominal employer. It permits the injured worker to recover from the company that was actually directing his work. It may also determine which of the possible employers ultimately bears the cost of the injury.' " 732 F.2d at 1249, quoting Baker v. Raymond International, Inc., 656 F.2d 173, 178 (5th Cir.1981))
 
 
 [11]
 Who furnished tools and place of performance
 
 
 [12]
 Some confusion has arisen from the application of the "borrowed employee" doctrine to the tort immunity under LHWCA context. See note 10 supra; Gaudet v. Exxon, 562 F.2d at 356-57. "Used in this context, the ["borrowed employee"] doctrine bears little resemblance to that doctrine evolved to hold the proper employer responsible for the torts his employee, the concept of respondeat superior." Gaudet v. Exxon, 562 F.2d at 356. The Gaudet court de-emphasized the "control" factor in LHWCA cases (which it conceded was the most important factor in the use of the "borrowed employee" doctrine in respondeat superior cases). Instead, this Court in Gaudet stressed the importance of the fourth, fifth, sixth, and seventh factors under Ruiz: "The principal focus within the Ruiz test in this case should therefore be: (1) was the second employer itself responsible for the working conditions experienced by the employee, and the risks inherent therein, and (2) was the employment with the new employer of such duration that the employee could be reasonably presumed to have evaluated the risks of the work situation and acquiesced thereto?" Gaudet v. Exxon, 562 F.2d at 357. This Court in Gaudet considered these factors the most important when the "borrowed employee" doctrine is used as a defense to tort liability in the LHWCA context because these factors deal with the question of whether the circumstances of the employee's employment are such that the defendant "should be considered an employer and not a third party under the LHWCA." Id. Third parties, of course, are not afforded the immunity of LHWCA Sec. 905(a). See also Alday v. Patterson, 750 F.2d at 376-77
 
 
 [13]
 Alday v. Patterson Truck Line, Inc. and West v. Kerr-McGee, both supra, do not prevent us from so holding. In those two cases, the main issue was whether the district court acted properly in granting summary judgment on the "borrowed employee" issue prior to trial when there was a similar contract provision. In those cases, we held that summary judgment on the "borrowed employee" issue not proper because of this disputed fact issue. In the case at bar, there was a trial, albeit a nonjury trial, on the "borrowed employee" issue, and the court made the finding of fact on the issue of the agreement between Beraud and Amoco. Such a finding is not precluded. West v. Kerr-McGee Corp., 765 F.2d at 531, Alday v. Patterson Truck Line, Inc., 750 F.2d at 378. See also Gaudet v. Exxon, 562 F.2d at 357-59
 
 
 [14]
 LHWCA, 33 U.S.C. Sec. 904 now reads:
 (a) Every employer shall be liable for and shall secure the payment to his employees of the compensation payable under sections 907, 908, and 909 of this title. In the case of an employer who is a subcontractor, only if such subcontractor fails to secure the payment of compensation shall the contractor be liable for and be required to secure the payment of compensation. A subcontractor shall not be deemed to have failed to secure the payment of compensation if the contractor has provided insurance for such compensation for the benefit of the subcontractor.
 (b) Compensation shall be payable irrespective of fault as a cause for the injury.
 
 
 [15]
 The following sentence was added to the end of Sec. 905(a):
 "For purposes of this subsection, a contractor shall be deemed the employer of a subcontractor's employees only if the subcontractor fails to secure the payment of compensation as required by section 904 of this title."
 For the full text of Sec. 905(a), see note 9, supra.
 
 
 [16]
 "The legislative history of the 1984 amendments unambiguously demonstrates that Congress's sole purpose in amending Sec. 904(a) and Sec. 905(a) was to overrule [Washington Metropolitan Area Transit Authority v. Johnson, 467 U.S. 925, 104 S.Ct. 2827, 81 L.Ed.2d 768 (1984) ], and not to amend the borrowed-servant doctrine or otherwise modify LHWCA law." West v. Kerr-McGee, 765 F.2d at 530. The WMATA case had held that general contractors enjoyed LHWCA immunity from subcontractors' employees' tort suits "unless the [general] contractor has neglected to secure workers' compensation coverage after the subcontractor failed to so so," 467 U.S. at 938, 104 S.Ct. at 2835, merely because of the contractors' assumption of their statutory duty to provide workers' compensation under Sec. 904(a) if the subcontractor failed to do so even though there is no "borrowed employee" status. Louviere v. Marathon Oil Co., 755 F.2d 428 (5th Cir.1985) and Weathersby v. Conoco Oil Co., 752 F.2d 953 (5th Cir.1984) further explain this Circuit's interpretation and application of the 1984 amendments to Sec. 904(a) and Sec. 905(a)
 
 
 [17]
 There is no requirement that tort immunity under Sec. 905(a) attaches only to an employer who actually pays for his employees' worker's compensation (i.e. the premiums for the worker's compensation insurance coverage), although this conclusion might seem to be implied by the 1984 amendment to Sec. 905(a). West v. Kerr-McGee, however, explains the real meaning of this amendment to Sec. 905(a). See note 16 supra. Furthermore, in the case at bar, Amoco, in effect, did pay for Melancon's worker's compensation. Amoco paid Beraud $29 an hour for Mr. Melancon's services while Beraud paid Melancon only $10 an hour. Part of this $19 an hour overhead charge paid to Beraud obviously went to cover insurance costs including worker's compensation: the contract between Beraud and Amoco expressly said that Beraud was responsible for securing and maintaining such insurance. See note 7 supra
 
 
 [18]
 Mr. Melancon's accident occurred on an offshore platform on the Outer Continental Shelf off the coast of Louisiana. The Outer Continental Shelf Lands Act, 43 U.S.C. Sec. 1331 et seq., directs application of the laws of the adjacent state to resolve all disputes arising on the Shelf "[t]o the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations." 43 U.S.C. Sec. 1333(a)(2)(A). Knapp v. Chevron, 781 F.2d at 1129. See also Rodrigue v. Aetna Casualty and Surety Co., 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969)