James Franklin **HARDIN**

v.

**CONOCO, INC.**

Civ. A. No. 88-0605 L.

United States District Court,
W.D. Louisiana,
Lafayette-Opelousas Division.

May 18, 1989.

---

Foret, Lafayette, La., Suzanne M. Jones, Lafayette, La., Mark S. Taylor, Metairie, La., for defendant.

## MEMORANDUM RULING ON MOTION FOR SUMMARY JUDGMENT

EDWIN F. HUNTER, Jr., Senior District Judge.

On August 17, 1987, James Franklin Hardin alleges he was injured on a fixed platform located in the Outer Continental Shelf off the coast of Louisiana. The platform was co-owned and operated by Conoco, Inc. The non-operating, co-owners are Texaco Inc. and Canadian–Oxy Offshore Production Company.

At the time of the accident, Hardin was working for Conoco Inc. through an agreement with T.J. Oilfield Services Inc. (T.J. O.). The contract called for T.J.O. to supply laborers to Conoco for the purpose of manning and operating certain offshore production platforms.

The moving parties seek dismissal, asserting that plaintiff was a "borrowed employee" of Conoco at the time of his alleged fall on a fixed platform in the Gulf of Mexico and therefore defendants are immune from suit in tort under the provisions of the Longshore and Harbor Workers' Compensation Act (LHWCA) 33 USCA Section 901–905.

### STATEMENT OF FACTS RE: EMPLOYMENT STATUS

T.J.O. is in the business of supplying labor services to different oil companies. The entire period in which plaintiff was nominally employed by T.J.O. (12 years), he worked exclusively for Conoco. He had been night operator for the last 5½ years on the same platform. Conoco provided him with transportation to and from work. All equipment used by Hardin in performing his work was owned and supplied by Conoco.

Plaintiff confirmed that no one from T.J. O. gave him work assignments and/or instructions regarding the work he was to perform. Moreover, plaintiff confirmed

Allen A. McElroy, Jr., Berwick, La., for plaintiff.

John A. Jeansonne, Jr., Lafayette, La., Gustin Perscich, Gretna, La., Norman P.

that his job was to follow the orders of the Conoco-rig boss.

Plaintiff was supplied with food and lodging by Conoco. His platform assignments were determined by Conoco. He worked directly under daily supervision by Conoco personnel. There were no T.J.O. personnel on board to control his work activities. Plaintiff would fill out daily time sheets, which would be reviewed by Conoco before plaintiff received his check from T.J.O. Conoco had the authority to terminate plaintiff's services if dissatisfied with him or if he was no longer needed. T.J.O. charged Conoco on an hourly basis for Hardin's services at a greater rate than he was paid.

### THE LAW

(A) *Recovery under the Longshoremen's and Harbor Workers' Compensation Act is an employee's exclusive remedy against his employer for injuries occurring on the Outer Continental Shelf.*

■ The Outer Continental Shelf Lands Act, 43 U.S.C.A. § 1331 *et seq.*, the jurisdictional basis for this lawsuit, specifically makes applicable the provisions of the Longshoremen's and Harbor Workers' Compensation Act for the compensation of injuries sustained by employees engaged in the work of producing oil and gas or other natural resources from the sub-soil or seabed of the Outer Continental Shelf. 43 U.S.C.A. § 1331(c). *See also, Gaudet v. Exxon Corp.*, 562 F.2d 351, 354 (5th Cir. 1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978).[1]

Hardin had worked on behalf of, and exclusively for Conoco on the same platform, on which he was hurt, for 5½ years prior to his accident. He was working on a Conoco platform located on the Outer Continental Shelf at the time of his alleged injuries. Conoco argues that under the provisions of the LHWCA 33 U.S.C. § 901 *et seq.*, he is barred from maintaining a civil action based in tort against Conoco, as his exclusive remedy for these injuries is for compensation under the provisions of the LHWCA.

(B) *At the time of his alleged injury on November 29, 1987, plaintiff was the borrowed employee of Conoco; therefore, his complaint should be dismissed by way of Summary Judgment.*

■ The issue whether a borrowed servant relationship exists is a matter of law. *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 314 (5th Cir.1969). The *Ruiz* Court suggested nine factors to be considered in determining whether the borrowed servant doctrine is applicable as a defense. These factors were subsequently enumerated in *Gaudet v. Exxon Corp.*, 562 F.2d 351, 357 (5th Cir.1977), *cert. denied* 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978) and in *Capps v. N.L. Baroid–NL Industries, Inc.*, 784 F.2d 615, 617 (5th Cir.1986), *cert. denied*, 479 U.S. 838, 107 S.Ct. 141, 93 L.Ed. 2d 83 (1986), as follows:

1. Who has control over the employee and the work he is performing, beyond mere suggestion of details?

2. Whose work is being performed?

3. Was there an agreement, understanding or meeting of the minds between the original and the borrowing employer?

---

1. The Longshoremen's and Harbor Workers' Compensation Act ("LHWCA") was designed to provide an injured employee with certain and absolute benefits *in lieu of* possible common law benefits obtainable only in tort actions against his employer. *Gaudet, supra* at 356. *See also, Haynes v. Rederi A/S ALADDIN*, 362 F.2d 345 (5th Cir.1966) *cert. denied*, 385 U.S. 1020, 87 S.Ct. 731, 17 L.Ed.2d 557 (1967). 33 U.S.C.A. § 905(b) provides:

"The liability of an employer prescribed in § 904 of this title shall be exclusive and in place of all other liability of such employer to the employee."
*See, Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970). Coverage under the LHWCA is not contractual, nor does it depend on the consent of the parties. When an employee begins work for an employer under the coverage of the LHWCA, he is presumed to have consented to the Act's trade-off of possible large common law damages for smaller but certain LHWCA benefits. *Gaudet, supra*, at 356.

4. Did the employee acquiesce in the new work relationship with the employee?

5. Did the original employer terminate his relationship with the employee?

6. Who furnished tools and place of performance?

7. Was the new employment over a considerable length of time?

8. Who had the right to discharge the employee?

9. Who had the obligation to pay the employee?

562 F.2d at 355.

If the evidence shows that the *"Gaudet factors"* are undisputed, the Court may grant summary judgment. *Gaudet v. Exxon Corp.*, 562 F.2d 351, 358–59 (5th Cir. 1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978).

■ With respect to the first factor, the right of control, Hardin himself testified that for the entire time of his employment, he received his platform work assignments from Conoco. Hardin has confirmed that it was his job to carry out the work instructions of, and be an assistant to the Conoco people working on each facility. He has confirmed that at no time did he consult with anyone from T.J.O. concerning the work he was performing. Corporation representatives have confirmed that the plaintiff was working under the exclusive direction and control of Conoco.

Conoco's control over Hardin was analogous to the control exercised by Amoco in *Melancon v. Amoco Production Co.*, 834 F.2d 1238 (5th Cir.), *reh'g granted in part and amended on other grounds*, 841 F.2d 572 (1988), in which the court found the plaintiff Melancon to have been the borrowed servant of Amoco. A comparison of the control exercised over Hardin and Melancon by their respective nominal employers leads to the conclusion that the first criterion of the *Ruiz* factors must be decided in mover's favor.

As to the second factor, there can be no doubt that Conoco's work was being performed by Hardin. He worked exclusively on Conoco's structures, including the main production platforms to which he was assigned.

Third, there was an agreement, understanding, or meeting of the minds that Hardin was performing as Conoco's borrowed employee. For years (12), while working on three different production platforms, Hardin was assigned exclusively by Conoco to Conoco's fields. He ate and slept with Conoco employees which food and lodging was provided by Conoco. Conoco supplied all of his tools and equipment. Conoco personnel were required to verify the hours reported on Hardin's daily time tickets before he could receive his paycheck from T.J.O. T.J.O.'s representatives had no communication with Hardin whatsoever concerning Hardin's work as a roustabout in Conoco's field.

Additionally, the service order and agreement between Conoco and T.J.O. did not prohibit Hardin from becoming Conoco's borrowed employee. In *Alexander v. Chevron U.S.A. Inc.*, 806 F.2d 526, 528 (5th Cir.1986), *cert. denied*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987), this Court interpreted a service contract almost identical in all respects to the Conoco/T.J.O. agreement and concluded that there was nothing in the contract that prohibited Conoco from becoming the borrowing employer of the lending employer's payroll employees. *Id.* at 528.

The *Melancon* Court reaffirmed the holding in *Alexander,* noting that a contractual provision specifying "no Beraud employee is to be considered the agent, servant or representative of Amoco," did not preclude a finding of "borrowed servant" status. In so holding, the court wrote:

In the case at bar, Beraud clearly understood that Melancon would be taking his instructions from Amoco, notwithstanding provision 6 of the contract. Obviously parties to the contract cannot automatically prevent a legal status like "borrowed servant employee" from arising merely by saying in a provision in their contract that it cannot arise.

*Id.,* at 1245. In the case at bar, T.J.O. understood, and Hardin acknowledged, that

all of his orders would come from Conoco supervisory personnel. Just as in *Melancon* and *Alexander*, Hardin cannot rely on a contractual provision to prevent him from becoming a borrowed servant, particularly in a case where every factor militates in favor of such a finding.

Finally, Conoco should not be prohibited from involving the borrowed servant defense because it did not pay Longshore and Harbor Workers' benefits to Hardin. Section 904(a) of the Longshore and Harbor Workers' Compensation Act (LHWCA) makes a general contractor secondarily liable for the payment of compensation benefits if the nominal employer fails to obtain the requisite insurance. That Conoco was not called on to pay benefits to Hardin in this case has no bearing on the borrowed servant issue and has never been part of the borrowed servant test. The borrowed servant defense is not limited to either situations in which benefits have been paid by the general contractor or instances where the lending employer fails to secure compensation coverage and the borrowing employer does. *Melancon*, 834 F.2d at 1247; *West v. Kerr–McGee*, 765 F.2d 526, at 528–530 (5th Cir.1985).

To find that the contractor must actually pay benefits before it is entitled to invoke the borrowed servant defense is contrary to established precedent, and would ignore the realities of the offshore oil production industry recognized by the Fifth Circuit in *Melancon*. After holding that the 1984 amendments to § 904(a) and 905(a) did not restrict the application of the borrowed servant status to instances when the lending employer fails to secure compensation coverage and the borrowing employer does, the Court reminded the litigants that the subcontractor's charge to Amoco for Melancon's services was $19 an hour over Melancon's $10 per hour salary. The Court recognized that part of this difference "obviously went to cover insurance costs including worker's compensation: the contract between Beraud and Amoco expressly said that Beraud was responsible for securing such payments." *Melancon*, 834 F.2d 1238, n. 17. Amoco was, in effect, defray-ing some of the costs of the premium for the contractors worker's compensation insurance.

Hardin clearly acquiesced in his work situation, the fourth *Gaudet* factor. As in *Melancon*, Hardin worked exclusively for Conoco on Conoco structures for twelve years prior to his accident. He continued working in this environment without complaint and without demanding reassignment.

The fifth *Gaudet* factor is whether the lending employer terminated its work relationship with the employee. In *Capps v. N.L. Baroid–NL Industries, Inc.*, 784 F.2d 615, 617 (5th Cir.1986), the Fifth Circuit noted that this factor does not require proof that a lending employer completely sever his relationship with the employee. The focus should be on the lending employer's relationship with the employee while the borrowing occurs. *Id.*, 784 F.2d at 618. As Hardin and T.J.O. representatives have confirmed, Hardin would only rarely contact T.J.O. personnel. Summarizing, the undisputed facts establishing the nominal employer's termination of the employment relationship are even more compelling here than in *Melancon* and *Alexander*. The only contact Hardin had with T.J.O. was to deliver his time sheet and pick up his check. T.J.O. placed no restrictions on Conoco with respect to Hardin or his employment conditions.

As it relates to the sixth *Gaudet* factor, Conoco furnished plaintiff with the place of employment, meals, lodging, and transportation to and from work. He worked exclusively on Conoco structures and exclusively used Conoco's tools and equipment. This relationship between the worker and the borrowing employer is even stronger than the situation in *Melancon* where the Court first noted that while the lending employer furnished most, if not all, of Melancon's welding equipment "Amoco furnished certain consummables, the place of performance, transportation to and from the place of work, food, lodging, etc." The Court stated that it had no trouble agreeing with the district court that this factor should be

decided in Amoco's favor. *Melancon*, 834 F.2d at 1246.

The three remaining factors require brief reference. Plaintiff was a worker for Conoco, the borrowing employer, for 12 years before the accident. Clearly, his employment was for more than a considerable time. It is undisputed that Conoco had the authority to terminate plaintiff's services and have him removed. Conoco's right to terminate Hardin's employment satisfied the eighth *Ruiz* factor. *Id.; Hebron v. Union Oil Co. of California*, 634 F.2d 245, 247 (5th Cir.1981); *Capps*, 784 F.2d at 618. He could have been terminated for any type of misconduct, including unsatisfactory job performance.

Finally, with respect to the last factor, as in *Alexander* and *Melancon*, Hardin filled in his time sheet and Conoco verified his hours. The time tickets were then delivered to Conoco and, ultimately, to his nominal employer which issued the paycheck. In *Alexander*, the Fifth Circuit found that this payment arrangement militated in favor of a finding of borrowed servant status. 806 F.2d at 528.

After applying the *Gaudet* factors, we have no other alternative than to hold that Hardin was Conoco's borrowed servant. The entry of summary judgment seems appropriate.

### C. *Summary Judgment is Appropriate In This Case.*

The United States Supreme Court and the Fifth Circuit have held that the standard to be applied by a court in deciding a motion for summary judgment is the same standard to be applied in deciding a motion for directed verdict or J.N.O.V. under F.R. C.P. Rules 50(a) and (b).

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court stated that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* 106 S.Ct. at 2510. Through Justice White the Court noted:

Our prior decisions may not have uniformly recited the same language in describing genuine factual issues under Rule 56, but it is clear enough from our recent cases that at the summary judgment stage the Judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial as *Adickes [v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ], *supra* and *Cities Service, supra*, indicate, there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Cities Service*, 391 U.S., at 288–289, 88 S.Ct., at 1592. If the evidence is merely colorable, *Dombrowski v. Eastland* [387 U.S. 82], 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) or is not significantly probative, *Cities Service, supra*, at 290, 88 S.Ct., at 1592, summary judgment may be granted.

*Id.* 106 S.Ct. at 2511.

The *Anderson* Court concluded that in weighing a motion for summary judgment the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

In *Matsushita Electric Industrial Co., Ltd., v. Zenith Radio Corporation*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Court once again emphasized that summary judgments are a favored procedural vehicle to dispose of issues to which there is no genuine issue for trial. In so doing, the Court reiterated the well-established proposition that "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Id.* 106 S.Ct. at 1356. *Citing First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), the Court again reminded the Federal judiciary that:

*Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.*

*Id.* (Emphasis added.)

■ The Supreme Court opinions rendered in *Anderson* and *Matsushita* place

emphasis on the need for summary judgment rather than reluctance to enter summary judgment. The language used by the *Matsushita* Court makes clear that the summary judgment is to be decided by the same standard as the trial motion for directed verdict. The issue now is not whether enough evidence exists to raise an inference to be resolved at trial, but rather whether sufficient evidence in the pretrial record exists to allow plaintiff to win at trial or survive a motion for directed verdict were one based on the submitted facts.

Following the direction of the Supreme Court, the United States Court of Appeals for the Fifth Circuit has reminded the district judges that "The mere existence of a disputed factual issue ... does not foreclose summary judgment. The dispute must be genuine, and the facts must be material." *Professional Managers et al. v. Fawer*, 799 F.2d 218, 223 (5th Cir.1986). The court continued:

> A party is entitled to defeat summary judgment and "go to the jury only if" there is evidence reasonably affording an inference that would sustain its position. The directed verdict/judgment n.o.v. analysis necessarily accounts for the effect of rules allocating the burden of proof on these issues.

*Id.*

The Fifth Circuit in *Fontenot v. Upjohn Co.*, 780 F.2d 1190 (5th Cir.1986), defined the crucial question in deciding a motion for summary judgment as:

> Whether there is a "genuine issue" in fact concerning any essential element of the claim on which judgment is being sought. If the moving party can show that there is no evidence whatever to establish one or more essential element of a claim on which the opposing party has the burden of proof, trial would be a bootless exercise, fated for an inevitable result but at continued expense for the parties, the pre-emption of a trial date that might have been used for other litigants waiting patiently in the judicial

queue, and a burden on the court and the taxpayers.

*Id.* at 1195 (citations omitted).

The *Upjohn* Court noted that a party seeking summary judgment is entitled to rely upon the complete absence of proof of an essential element of the other party's case if ample time has been allowed for discovery. *Id.* The party opposing a properly supported motion for summary judgment cannot discharge his burden by alleging legal conclusions. *Id.* at 1195. In so holding, the court wrote:

> There is no sound reason why conclusory allegations should suffice to require a trial where there is no evidence to support them even if the movant lacks contrary evidence.

*Id.* at 1196.

In effect, the *Fontenot* Court absolved the party seeking summary judgment from discharging the rigorous burden of proving the complete absence of any evidence to support a claim. Plaintiff, therefore, does not have a passive role in opposing Conoco's motion for summary judgment. It is not enough that plaintiff prove the existence of some factual dispute, plaintiff must show that there is a genuine issue of *material fact* upon which he could prevail at trial.

In the instant case the only result that any rational trier of fact can reach is that Mr. Hardin is Conoco's borrowed servant. The Fifth Circuit's decisions in *Alexander* and *Melancon, supra*, require this result.[2]

## CONCLUSION

There are no issues of fact as to Mr. Hardin's status as a borrowed employee of Conoco. As an employee's exclusive remedy against his employer for injuries sustained on the Outer Continental Shelf is for compensation under the provisions of the Longshoremen's and Harbor Workers' Compensation Act, Mr. Hardin's complaint

---

**2.** See also a copy of Judge Shaw's opinion in *Roche v. Mark Producing,* a copy of which is attached. (March 28, 1988).

against Conoco and its associates must be dismissed.[3]

Counsel for Conoco is to submit appropriate judgment. A rule 54(b) order will be entered only if plaintiff agrees. There are pluses and minuses both ways.

THUS DONE AND SIGNED.

## APPENDIX

United States District Court

Western District of Louisiana

Lafayette–Opelousas Division

John Alton Roche, et ux,

vs.

Mark Producing, Inc., et al.

Civil Action Number 86–0385

### RULING

Now before the court is the motion is the motion of Mark Producing, Inc. ("Mark") for summary judgment against the plaintiffs John and Sharlene Roche. The defendant Mark alleges that the plaintiff John Roche is its borrowed employee. Thus, under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331, et seq., the exclusive remedy available to Mr. Roche against Mark is through either the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901, et seq., or the Louisiana Workmen's Compensation Act. The plaintiff opposes the motion on the grounds that the evidence does not establish that John Roche was a borrowed employee of Mark. There is no dispute over the material facts, but the parties do dispute the conclusions which should be drawn from those facts.

### Findings of Fact

John Roche was hired by Production Management Corporation ("PMC") on August 23, 1984. PMC is a company which provides crewmembers to oil producing companies. PMC contracted with Mark to provide personnel for West Cameron Block 570. John Roche continuously worked at that location from the beginning of his employment until the date of his accident on February 23, 1985. The plaintiff was directly supervised by Don Riley and Tom Motchman, the Mark superintendent and lead operator, respectively. He was an electrician whose work duties included day-to-day maintenance and repair. Mark provided the facility for Roche to work and sleep and also provided him with tools. While PMC had the ultimate right to discharge the plaintiff, Mark could request replacement of nonsatisfactory PMC employees. Likewise, PMC could transfer one of its employees of its own volition. Mr. Roche received his wages from PMC, based on an hourly rate.

### Conclusions of Law

The district court decides the borrowed employee issue as a matter of law, *Gaudet v. Exxon Corp.*, 562 F.2d 351 (5th Cir.1977); and, if sufficient basic factual ingredients are undisputed, the court may grant summary judgment. *Id.* at 358–59. In *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 312–13 (5th Cir.1969), the Fifth Circuit suggested nine factors to be evaluated in determining whether the borrowed employee doctrine applies:

(1) Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?

(2) Whose work is being performed?

(3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

(4) Did the employee acquiesce in the new work situation?

(5) Did the original employer terminate his relationship with the employee?

---

**3.** One must compliment plaintiff's counsel for his novel and persuasive effort to "estop" Conoco from asserting the "borrowed employee" status because of its (Conoco's) refusal to employ Hardin, together with his argument as to the differential in pay and benefits received by regular Conoco employees. Nevertheless, we feel obliged by the jurisprudence to grant defendants' motion for summary judgment. See *Davidson v. Enstar Corporation*, 860 F.2d 167 (5th Cir.1988) on rehearing and *Bertrand v. Forest Oil*, 441 F.2d 809 (5th Cir.1971) as to the claim against the associates.

(6) Who furnished tools and place for performance?

(7) Was the new employment over a considerable length of time?

(8) Who had the right to discharge the employee?

(9) Who had the obligation to pay the employee?

This court finds the analysis of these factors set forth in *Capps v. NL Baroid–NL Industries, Inc.*, 784 F.2d 615, 617 (5th Cir.1986) is particularly applicable to the present dispute. The court will consider the *Ruiz* factors and their inferences in light of the opinion in *Capps*.

The first and most important factor is: Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation? The plaintiff argues that Mark merely suggested details of the work to be performed. He also maintains that the Blanket Service Agreement between Mark and PMC explicitly states that "Mark shall have no control over [PMC's] employees." The language in the Blanket Service Agreement does not reflect the actual situation which existed during Mr. Roche's employ. Terry Boutte, the PMC Production Superintendent, testified that the plaintiff received instructions concerning his work duties from Mark employees. Thus, Mark did in fact control the employee while he was working at West Cameron Block 570.

The second factor—Whose work is being performed?—can be answered straightforwardly. All of the work Roche performed furthered Mark's business. He was involved in general upkeep and electrical maintenance for the production facility. In fact, PMC's business existed solely to furnish employees to oil producing companies in order to perform their work. It is clear that Mark's work was being performed.

The third factor asks whether an agreement or understanding existed between the original and borrowing employer. The written agreement specifically provided that Mark should have no control over PMC's employees and that the plaintiff would not be considered an employee of Mark for any purposes. The agreement as a whole reflects the understanding that producing companies such as Mark routinely contacted PMC and asked for certain types of employees. PMC then turned those employees over to the control of those producing companies. While conflicting inferences can be drawn from the agreement between the original and borrowing employer, this court finds that this factor does not weigh in either party's favor.

The fourth factor asks whether the employee acquiesced in the new work situation. Since Roche worked for a company who loaned employees, Roche knew that PMC would send him into different work situations. In this case, Roche's entire employment history with PMC involved working for Mark. He clearly acquiesced in his original work situation.

The fifth factor asks whether the original employer terminated his relationship with the employee. The plaintiff argues that Roche did not sever his relationship with PMC. Mark explains that while Roche worked for Mark, he temporarily terminated his relationship with PMC. The court in *Capps*, at 617–18, explained:

> We do not believe that this factor requires a lending employer to completely sever his relationship with the employee. Such a requirement would effectively eliminate the borrowed employee doctrine as there could never be two employers. The emphasis when considering this factor should focus on the lending employer's relationship with the employee while the borrowing occurs.

In the instant case, PMC exercised no control over Roche while he worked for Mark.

The sixth factor is: Who furnished tools and place for performance? Roche brought no tools with him and Mark furnished the facility on which to work and sleep.

The next factor asks whether the employment was over a considerable length of time. Roche worked a seven-on/seven-off shift for about six months. This is a considerable length of time, given that the

Fifth Circuit has previously found borrowed servant status when the employee's injury occurred on the first day of the job. *See Champagne v. Penrod Drilling Co.,* 341 F.Supp. 1282 (W.D.La.1971), *aff'd. per curiam,* 459 F.2d 1042 (5th Cir.1972).

The eigth factor asks: Who has the right to discharge the employee? Mark had the right to discharge Roche from his employment with Mark; however, Mark could not terminate Roche's employment with PMC. In *Hebron v. Union Oil Co. of California,* 634 F.2d 245 (5th Cir.1981), the court held that the proper focus of inquiry was to determine if the borrowing employer had the right to terminate the employee's services with itself. Mark did have the right to discharge Roche from his association with Mark.

The ninth factor asks: Who had the obligation to pay the employee? Clearly, PMC was obligated to pay Roche an hourly rate. However, PMC received the funds to pay Roche from Mark. While this factor may weigh against the mover, it is not one of the more important factors.

This court concludes that the most important factor, control of the employee, weighs heavily in favor of borrowed employee status. Furthermore, six of the remaining eight factors also weigh in favor of borrowed servant status. The third factor does not weigh in favor of either party as conflicting inferences can be drawn from the agreement between Mark and PMC. And while the ninth factor seems to weigh against borrowed servant status, this court does not weigh that factor heavily in the determination of status.

Accordingly, this court finds that the analysis of the *Ruiz* factors clearly warrants a finding that John Roche was the borrowed employee of Mark Producing, Inc. Therefore, plaintiff's sole remedy against Mark Producing, Inc. is compensation pursuant to the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C.A. §§ 901–905 or the Louisiana Worker's Compensation Act. The motion for summary judgment by Mark Producing Co. against John and Sharlene Roche is hereby GRANTED.

Opelousas, Louisiana, March 9, 1988.

/s/ John M. Shaw
JOHN M. SHAW
UNITED STATES DISTRICT JUDGE

## JUDGMENT

It is ORDERED, ADJUDGED AND DECREED that the defendant Mark Producing, Inc. is hereby DISMISSED WITH PREJUDICE, in accord with the ruling of court on this day.

Opelousas, Louisiana, March 9, 1988.

/s/ John M. Shaw
JOHN M. SHAW
UNITED STATES DISTRICT JUDGE