Richard F. WILLIS and Sheila Willis, Plaintiffs,

v.

CABINDA GULF OIL COMPANY and Nalco Chemical Company, both Delaware corporations, Defendants.

Civ. A. No. 87–595 MMS.

United States District Court,
D. Delaware.

Jan. 3, 1990.

John M. Bader of Tomar, Simonoff, Adourian & O'Brien, Wilmington, Del.; Gerald E. Meunier of Gainsburgh, Benjamin, Fallon, David & Ates, New Orleans, La., of counsel, for plaintiffs.

Donald E. Reid of Morris, Nichols, Arsht & Tunnell, Wilmington, Del.; Adrian Colley, San Ramon, Cal., of counsel, for defendants.

## OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

On July 17, 1985 plaintiff Richard Willis slipped and fell on a stairwell while working on a fixed oil drilling platform owned by defendant Cabinda Gulf Oil Company (hereinafter "Cabgoc"). The platform was located off the coast of Angola, Africa. Willis brought suit in this court seeking damages from Cabgoc for injuries he sustained from the July 17, 1985 fall.[1] Cabgoc has moved for summary judgment, alleging as an affirmative defense that Willis was its "borrowed employee" at the time of the accident and that his exclusive remedy is for workmen's compensation benefits. This court has jurisdiction pursuant to 28

---

1. Willis' wife has filed a claim for loss of consortium. Since her claim is derivative of her husband's the court shall address itself solely to Richard Willis' claim in this motion for summary judgment. Willis also seeks damages from Nalco Chemical Co., the manufacturer of the substance Willis alleges caused slippery conditions on the stairwell the day of the accident. Defendant Nalco Chemical Co. is not involved in this motion for summary judgment.

U.S.C. § 1332(a). Willis and Cabgoc have stipulated that Louisiana law governs the issues before the court on Cabgoc's motion for summary judgment.[2]

On the basis of the record before it, this court will deny defendant's summary judgment motion. However, pursuant to Federal Rule of Civil Procedure 56(d), the court shall

> ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy ... and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

The court will also decide certain legal questions concerning the test for borrowed employee status at this time.

THE FACTS

The parties demonstrate a remarkable degree of agreement on the facts of this case. They disagree only as to the meaning of the legal standards to be applied by the court. The general facts concerning Willis' employment on the drilling platform are set forth here. Other facts will be discussed where relevant.

In December 1982 Richard Willis responded to a newspaper advertisement for overseas employment placed by Seco Industries (hereinafter "Seco"). Deposition of Richard Willis taken January 15, 1987 at 20 (reproduced in Appendix to Defendant Cabgoc's Opening Brief (Dkt. 44A)) (hereinafter "Willis Deposition I"). He initially applied for a position as a rotating equipment specialist and was eventually hired as a production operator for the Cabgoc platform off the Angolan coast. Willis Deposition I at 20 & 22. He signed an employment contract with Seco dated December 3, 1982. Appendix to Defendant Cabgoc's Opening Brief at 57 (Dkt. 44A) (hereinafter cited as "A-# "). The contract indicated

the "Foreign Location" of Willis' employment would be "Cabinda/Angola/Africa". A-57.

Willis was hired by Seco to work at Cabgoc's platform pursuant to a contract between Seco and Cabgoc dated August 22, 1979. A-50-56. That contract provides:

> The CONTRACTOR [Seco] shall supply the COMPANY [Cabgoc] the services of such expert personnel as shall be required by the COMPANY and specified in the ADDENDA attached to this AGREEMENT and for such times and rates as also specified in accordance with the terms and conditions as set forth below.

A-51. Addendum "R" to the Cabgoc-Seco contract provides:

> The following constitutes the details of services, personnel periods and rates in accordance with the preceding AGREEMENT signed between CABINDA GULF OIL COMPANY and SECO INDUSTRIES, INC. dated the 31st day of January, 1983.
>
> Services of Richard Willis to assist COMPANY [Cabgoc] as Production Operator for the oil and gas production facilities of CABINDA GULF OIL COMPANY in the Peoples Republic of Angola and any and all other duties as may reasonably be required by COMPANY....

A-56. The Addendum was signed by representatives of both Cabgoc and Seco.

The contract between Cabgoc and Seco sets forth in detail the obligations of each. For instance, Cabgoc was responsible for paying transit costs and providing Angolan work permits. Cabgoc also obligated itself to provide Seco personnel with free medical attention, food, accommodations and laundry facilities equivalent to that provided to its own personnel. A-51. Cabgoc designated "person or persons to give instructions" and provided all necessary equipment. A-52. Seco prepared all tax returns required by the Angolan government

---

**2.** "IT IS HEREBY STIPULATED by the parties to Cabinda Gulf Oil Company's pending summary judgment motion that Louisiana law applies on the issue of the 'borrowed servant' doctrine." *Willis v. Cabinda Gulf Oil Co.,* C.A. No. 87-595 MMS (Docket No. 44) (hereinafter Dkt. ___).

and obtained visas for transit through Zaire. Seco agreed to maintain workers' compensation and general liability insurance. A–52. Seco also agreed to "defend, indemnify and hold [Cabgoc] harmless against all losses, expenses and claims for death or personal injury to any persons (including [Seco's] employees), or property damage arising out of performance of work by [Seco], whether arising out of negligence on part of [Cabgoc] or otherwise.)" A–53

Finally,[3] the contract provides:

If [Seco's] personnel is at any time during the course of the AGREEMENT determined to be unfit to perform these duties due to intemperance, incompetence, lack of necessary cooperation, or because of prolonged or repeated illness, [Seco] will, upon receipt of a written request specifying the deficiency, immediately remove the said personnel at [Seco's] expense and within a period of thirty (30) days, replace him....

A–53.

Willis worked on the oil platform for a period of approximately three years, from January 1983 through January 1986. Willis Deposition I at 40; Deposition of Richard Willis conducted January 27, 1989 at 46 (reproduced in the Appendix to Defendant Cabgoc's Opening Brief (Dkt. 44A)) (hereinafter "Willis Deposition II"). He worked a schedule of 28 days on the job site and 28 days off duty.[4] Willis Deposition I at 23–24. During his 28 days "on duty" Willis lived on a supertanker supplied by Cabgoc and travelled between the tanker and the platform by helicopter or boat supplied by Cabgoc. Willis Deposition I at 32–33; Willis Deposition II at 48. His duties aboard the platform consisted mainly of maintain-

ing the platform.[5] He also supervised Angolan nationals employed by Cabgoc to work on the platform. Willis Deposition II at 48; Deposition of Glenn Cheek taken October 20, 1988 at 101 (reproduced in the Appendix to Defendant Cabgoc's Opening Brief (Dkt. 44A)) (hereinafter "Cheek Deposition"). His supervisor on the platform was Thomas Lee, a Cabgoc employee. *See* Willis Deposition I at 49; Cheek Deposition at 100–102; Deposition of Thomas Lee, taken November 22, 1988 at 9 & 13–14 (reproduced in Appendix to Defendant Cabgoc's Opening Brief (Dkt. 44A)) (hereinafter "Lee Deposition").

In briefing and at oral argument, plaintiff adopted defendant's version of the facts, calling the court's attention to two facts he deems significant:

(1) Plaintiff ... did not consider himself a "borrowed servant" but at all times regarded himself as primarily the employee of Seco; (2) Seco and not Cabgoc, has been paying plaintiff worker's compensation benefits.

Plaintiff's Answering Brief at 3 (Dkt. 42).

### PROPRIETY OF SUMMARY JUDGMENT

Plaintiff strenuously argues that the court should not decide Cabgoc's affirmative defense on summary judgment in light of the fact-based nature of the test for borrowed employee status under Louisiana law. Before addressing the propriety of summary judgment in cases such as this, the court must first determine the test it must apply.

### 1. Borrowed Employee Status Under Louisiana Law

The Louisiana courts have adopted a multi-factor test to determine when an indi-

---

**3.** The above, of course, is not an exhaustive description of the obligations set forth in the contract, but rather highlights those provisions that have been urged as bearing upon the borrowed servant issue.

**4.** During his 28 days "off" Willis would generally return to the United States to be with his family. Willis Deposition I at 24.

**5.** Q: On the platform itself, ... what exactly was it that you did on a day-to-day basis?

A: Just like I told you a minute ago, just making sure that the oil kept flowing and checking the well jackets and taking the readings and making sure your flow didn't drop off or whatever, you know, and just basic maintenance of the platform, keeping everything running and fixed.

Q: Your job then, as I understand it, primarily was to make sure that the platform continued production—

A: Right.

Willis Deposition I at 47.

vidual is the borrowed employee of another:

(1) first and foremost, right of control; (2) selection of employees; (3) payment of wages; (4) power of dismissal; (5) relinquishment of control by the general employer; (6) which employer's work was being performed at the time in question; (7) agreement, either implicit or explicit, between the borrowing and lending employers; (8) furnishing of necessary instruments and the place for performance of the work in question; (9) length of time in employment; and (10) acquiescence by the employee in the new work situation.

*Brumbaugh v. Marathon Oil Co.,* 507 So.2d 872, 875 (La.Ct.App., 5th Cir.), *writ denied,* 508 So.2d 824 (La.1987) (citing numerous Louisiana state and federal cases).[6] The weight accorded the individual factors is fluid and varies with the facts of each case. *Id.* ("This jurisprudence, however, fully recognizes that neither control nor any other single factor is decisive, and no fixed test is used to determine the existence of a borrowed servant relationship.").

The borrowed employee doctrine first arose in the context of the borrowing employer's vicarious liability for torts committed by the borrowed employee.[7] In that context, the doctrine was principally wielded as a sword by injured plaintiffs and lending employers seeking compensation from the borrowing employer. For purposes of vicarious liability, the emphasis was on the degree of control exercised by the borrowing employer over the employee. *See generally* 1C A. Larson, *The Law of Workmen's Compensation* §§ 48.10–.11 (1986).

In this case, however, Cabgoc is using the doctrine to shield itself from tort liability to its borrowed employee. If Willis was its borrowed employee at the time of the accident, then Cabgoc is Willis' statutory employer, and Willis has no recourse against it other than for workmen's compensation benefits. In the workmen's compensation context, the emphasis shifts from control to other factors of the test. Certain factors stand out under Louisiana law as important in the workmen's compensation context:

> However, the borrowed servant doctrine, when used as a defense by the defendant-"employer" and "coemployee" to a tort action, must be distinguished from the borrowed servant doctrine as in the context of respondeat superior.... [I]n determining the special employer's liability for worker's compensation, ... "the control exercised over the special employee in the performance of work

---

**6.** The Fifth Circuit Court of Appeals applying Louisiana law stated the test as follows:

> The test to be employed in determining the special employer's liability for compensation is the control exercised over the special employee in the performance of work that is part of the special employer's business. The right of control includes the following factors: the right to select and discharge the employee, the right to supervise and direct his work, and the method by which it is done, and the manner in which the employee is paid. Implicit in the right to control is the necessity that the lending employer relinquish its control over its employee to the borrowing employer and that he is performing work for the borrowing employer's business. Additionally, the concept of the "borrowed employee" doctrine, connotes an agreement of some type between the lender and the borrower, that the lender relinquished such control of the employee to the borrower.

*Liberty Mutual Insurance Co. v. Gulf Oil Corp.,* 559 F.Supp. 777, 781 (E.D.La.1983), *aff'd,* 725 F.2d 293 (5th Cir.1984) (citation omitted).

**7.** The United States Supreme Court first recognized the doctrine in *Standard Oil v. Anderson,* 212 U.S. 215, 220, 29 S.Ct. 252, 253, 53 L.Ed. 480 (1909), in which it stated: "One may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred, with his own consent or acquiescence, to the service of a third person, so that he becomes the servant of that person with all the legal consequences of that new relation." The Court elaborated further:

> It sometimes happens that one wishes a certain work to be done for his benefit and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work and places them under his exclusive control in the performance of it, those men became *pro hac vice* the servants of him to whom they are furnished.

*Id.* at 221, 29 S.Ct. at 254.

that is part of the special employer's business" [is] a significant factor.... [C]onsidering the doctrine in the context of the special employer's liability for compensation, ... two [other] factors [are] of significant value: "(1) was the second employer itself responsible for the working conditions experienced by the employee, and the risks inherent therein and, (2) was the employment with the new employer of such duration that the employee could be reasonably presumed to have evaluated the risks of the work situation and acquiesced thereto?" *Brumbaugh,* 507 So.2d at 875–76 (quoting *Lambert v. James A. Teague Rental Equip., Inc.,* 278 So.2d 544, 549 (La.App. 1st Cir.), *writ not considered,* 281 So.2d 750 (La.1973) and *Gaudet v. Amoco Production Co.,* 562 F.2d 351, 358, *reh'g denied,* 565 F.2d 1215 (5th Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978)).

Plaintiff urges that the consideration of each factor in the test requires the court to determine a fact or draw an inference from the facts. Therefore, plaintiff contends, it would be inappropriate for this court to decide whether he was Cabgoc's borrowed employee on summary judgment. He also emphasizes the court's discretionary authority to deny summary judgment under appropriate circumstances even when the movant has made a case for it on the record. *See* 6 J. Moore & J. Wicker, *Moore's Federal Practice* § 56.15[6] (1988). Plaintiff raises important considerations concerning the nature and purpose of summary judgment.

## 2. Standard for Summary Judgment

In 1986 the United States Supreme Court decided a trilogy of cases, *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), in which it refocused the burdens of the movant and non-movant on motions for summary judgment.

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

When the movant has carried its burden under Rule 56(c), the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355 (citation omitted) (footnote omitted). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both *genuine* and *material. Liberty Lobby,* 477 U.S. at 247–48, 106 S.Ct. at 2509–10. A dispute over facts is "material" if, under the substantive law, it would affect the outcome of the suit. *Id.* at 248, 106 S.Ct. at 2510. A factual dispute is "genuine" if a reasonable jury could return a verdict for the non-movant. *Id.* Any inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing summary judgment. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356 (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)). The non-moving party must produce more than a mere scintilla of evidence to successfully oppose summary judgment. *See Williams v. Borough of West Chester,* 891 F.2d 458 (3d Cir.1989). Summary judgment will be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

The standard for summary judgment is similar to that for a directed verdict. *Liberty Lobby,* 477 U.S. at 251–52, 106 S.Ct. at 2511–12 ("In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."). This does not mean,

however, that the court in deciding a motion for summary judgment may weigh the evidence. The court should not grant summary judgment merely because it believes the movant will prevail at trial. Nor should the court grant summary judgment in the belief that a jury verdict for the non-movant at trial would be set aside as against the weight of the evidence. *See* 6 J. Moore & J. Wicker, *supra* at § 56.15[6]. Furthermore, the court should not grant summary judgment unless it is reasonably certain that judgment may be justly rendered without a trial. *Id.*

None of the foregoing implies, however, that summary judgment is unavailable in difficult or complex cases. So long as no genuine issue of material fact remains, a court may decide even complex cases on summary judgment if the movant is so entitled as a matter of law. *See generally* 6 J. Moore & J. Wicker, *supra* at § 56.16 and the cases cited therein. For instance, although *Matsushita* was an extremely complex antitrust case involving a 40–volume record,[8] the Court in that case overturned the appellate court's reversal and reinstated the District Court's grant of summary judgment. *Matsushita*, 475 U.S. at 598, 106 S.Ct. at 1362. The Court's decision turned solely on whether there was a genuine dispute of material fact. Nothing in *Matsushita* or in *Liberty Lobby* (a First Amendment case) indicates that complex issues cannot or should not be resolved on summary judgment so long as there remains no genuine issue of material fact.

With these principles in mind, I turn now to the propriety of deciding Cabgoc's motion for summary judgment in the present case.

### 3. Propriety of Determining Borrowed Employee Status on Summary Judgment

■ The Louisiana courts consider borrowed employee status to be a question of fact. This does not mean, however, that a court cannot grant summary judgment on the question when there remains no genuine issue of fact between the parties. The court has been unable to find any Louisiana case analyzing the propriety of summary judgment proceedings to decide borrowed servant status. Several Louisiana intermediate appellate courts have reversed grants of summary judgment on the borrowed employee status. These reversals, however, have been based upon the appellate courts' determinations that there existed a genuine issue of material fact. None of those courts indicated that the issue itself might be inappropriate for disposition on summary judgment. *E.g., Ferguson v. Lambert*, 501 So.2d 911 (La.Ct.App., 5th Cir.1987); *Frye v. Texas Brine Corp.*, 425 So.2d 310 (La.Ct.App., 3d Cir.1982). In *Owens v. AAA Contracting*, 219 So.2d 226 (La.App. 1st Cir.1969), the Louisiana appellate court reversed summary judgment on other grounds but upheld the trial court's grant of summary judgment as to borrowed servant status in the respondeat superior context.

The court sees no reason why it should not decide Willis' status as a borrowed employee on summary judgment provided no genuine issue of material fact exists.[9]

---

8. Stating the facts of this case is a daunting task.
   The opinion of the Court of Appeals for the Third Circuit runs to 69 pages; the primary opinion of the district Court is more than three times as long. Two respected District Judges each have authored a number of opinions in this case; the published ones alone would fill an entire volume of the Federal Supplement. In addition, the parties have filed a 40–volume appendix in this Court that is said to contain the essence of the evidence on which the District Court and the Court of Appeals based their respective decisions.

*Matsushita*, 475 U.S. at 576–77, 106 S.Ct. at 1350–51 (citation omitted).

9. The federal courts have generally held that the borrowed servant issue is appropriate for summary judgment disposition. The leading case on this subject appears to be the decision of the Fifth Circuit Court of Appeals in *Gaudet v. Exxon Corp.*, 562 F.2d 351 (5th Cir.1977), a case arising under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C.A. §§ 901–950 (hereinafter "LHWCA"). In *Gaudet*, as in the case before this court, the injured worker argued that "the granting of summary judgment on this point was inappropriate because wheth-

Both in briefing and at oral argument plaintiff adopted defendant's version of the facts. Given the purpose of the summary judgment proceeding "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial," Fed.R.Civ.P. 56 advisory committee note to the 1963 Amendment, and the remarkable degree of agreement between the parties as to the facts, the case at bar is especially appropriate for disposition of the borrowed servant issue on summary judgment.

The court will now consider the factors in turn and determine whether a genuine issue of material fact exists as to each factor. Since Cabgoc asserts the borrowed servant doctrine as an affirmative defense, it bears the burden of proof as to the existence of each factor.

## WAS WILLIS THE BORROWED EMPLOYEE OF CABGOC?

■ The test for determining Willis' status as Cabgoc's borrowed employee bears repeating:

(1) first and foremost, right of control; (2) selection of employees; (3) payment of wages; (4) power of dismissal; (5) relinquishment of control by the general employer; (6) which employer's work was being performed at the time in question; (7) agreement, either implicit or explicit, between the borrowing and lending

employers; (8) furnishing of necessary instruments and the place for performance of the work in question; (9) length of time in employment; and (10) acquiescence by the employee in the new work situation.

*Brumbaugh v. Marathon Oil Co.,* 507 So.2d 872, 875 (La.Ct.App., 5th Cir.), *writ denied,* 508 So.2d 824 (La.1987) (citing numerous Louisiana state and federal cases). In the context of a workmen's compensation case, the most important considerations include right of control, the employee's acquiescence (including the employees' opportunity to evaluate the risks of working conditions under the borrowing employer) and which employer provided working conditions that created the risk. *See supra.*

Under Louisiana law, Cabgoc must overcome a presumption that Seco, as Willis' general employer, retained control of its employee. *Marzula v. White,* 488 So.2d 1092, 1095 (La.Ct.App., 2d Cir.1986). In order to overcome this presumption, Cabgoc must show that "the employer-employee relationship between the general employer and his employee has been suspended and a new and like relationship has been created between the general employer's employee and the special employer [Cabgoc]." *Id.*[10]

---

er one is a borrowed employee is itself an issue of disputed fact...." *Id.* at 357. The circuit court started from the premise that "'the issue of whether a relationship of borrowed servant existed is a matter of law'.... A dispute over whether one is a borrowed servant ... could still exist although all the facts were stipulated, for it concerns not only the facts themselves but the implications to be drawn from the facts." *Id.* at 357–58 (quoting *Ruiz v. Shell Oil Co.,* 413 F.2d 310, 314 (5th Cir.1969)). In determining the propriety of summary judgment, the *Gaudet* court noted the worker could not "generate a factual dispute merely by contesting the conclusion reached by the court, rather [he] must show that genuine disputes exist over enough determinative factual ingredients to make a difference in this result." *Id.* at 358; *see also Littleton v. Mardigan,* 458 F.2d 251 (7th Cir. 1972) (applying Indiana worker's compensation law and upholding summary judgment).

The Third Circuit Court of Appeals has decided an appeal from summary judgment that an injured worker was a borrowed employee within the meaning of Pennsylvania's workmen's

compensation scheme. *Joyce v. Super Fresh Food Markets, Inc.,* 815 F.2d 943 (3d Cir.1987). The parties in that case apparently did not raise the propriety of deciding the issue on summary judgment. Although the circuit court reversed summary judgment, it did so because it found that "the district court made various findings concerning key indicia of control that were either erroneous or controverted in the record." *Id.* at 949. In dicta, the court stated: "In deciding whether Super Fresh was the employer at the time of the accident 'any discrepancies in the facts would be for a jury to resolve; however, whether the facts as they are determined to exist constitute an employment relationship is strictly a question of law.'" *Id.* at 947 (quoting *English v. Lehigh County Auth.,* 286 Pa.Super. 312, 322, 428 A.2d 1343, 1348 (1981)). *See also Williams v. Delta Truck Body Co.,* 892 F.2d 327 (3d Cir.1989).

**10.** This presumption may also be stated as follows:

What gives the lent-employee cases their special character, however, is the fact that

The parties agree Willis was performing Cabgoc's work at the time of the accident (factor 6). They also agree Cabgoc furnished Willis with all necessary equipment and provided the workplace and conditions inherent therein (factor 8). They agree Willis performed Cabgoc's work for a length of time sufficient to make him its borrowed employee should the other factors be satisfied (factor 9). Transcript of Oral Argument, *Willis v. Cabinda Gulf Oil Co.*, C.A. No. 87–595 MMS at 2–3 & 7 (November 21, 1989) (Dkt. 45) (hereinafter "Transcript at ____"). The parties do not dispute that Seco selected and hired Willis (factor 2). Cabgoc asserts—and Willis disputes—the existence of the remaining factors. Each factor will be considered in turn. Taken as a whole, they must demonstrate that the employment relationship between Seco and Willis was suspended and that a new and like relationship was created between Cabgoc and Willis.

*Right of Control (Factor 1)*

The parties dispute both the nature and degree of control required under this factor. Cabgoc emphasizes that it had a *right* to give Willis instructions and to supervise his work on the platform. Defendant points to the clause in its contract with Seco stating that Cabgoc designated "person or persons to give instructions." A–52. Cabgoc also points to various references in the record—including statements by plaintiff Willis—that Thomas Lee, a Cabgoc employee, was Willis' supervisor on the platform. *See* Willis Deposition I at 49 ("If we had a problem, [Lee] would come out. And he'd usually come out every day and check the platform with us.... If we had [any major problems], we'd call him"); Cheek Deposition at 102 ("Everybody worked for Tommy Lee"); Lee Deposition at 9 & 13–14. Additionally, Cabgoc stress-

es that there was no Seco supervisor on the platform.

Willis does not dispute Cabgoc's assertions, but emphasizes the lack of control *actually exercised* over him by Cabgoc. He notes that he is a skilled worker who frequently worked without supervision and that Lee was not continually on the platform. He also points out that he supervised the Angolan nationals employed by Cabgoc on the platform. Willis Deposition II at 48; Cheek deposition at 101. Finally, he notes Thomas Lee refers to him as "an employee of Seco." Lee Deposition at 13.

The first task for the court is to determine whether the "control" factor requires that Cabgoc have the *right* to control Willis or that it actually *exercise* control over him. The court concludes that the appropriate standard is whether Cabgoc had the right to control. *See Ferguson v. Lambert*, 501 So.2d 911 (La.App. 5th Cir.1987) ("The most commonly employed test in this regard is the '*right* of control,' which includes a determination of whether the general employer has relinquished its *right* to control the employee....") (emphasis added).

The borrowing employer need not preside over every technical detail of the borrowed employee's work. This is especially true of skilled employees like Willis who are presumably borrowed because the employer lacks the resources or personnel necessary to perform the technical work. All that is required is that the borrowing employer possess the right to dictate the time and place the employee is to render his services and the degree and amount of those services. *See* 1C A. Larson, *The Law of Workmen's Compensation* § 48.30 at 8–502 (1986). The fact that Willis frequently worked unsupervised and thus ap-

they begin, not with an unknown relation, but with an existing employment relation.... The only presumption is the continuance of the general employment, which is taken for granted as the beginning point of any lent-employee problem. To overcome this presumption, it is not unreasonable to insist upon a clear demonstration that a new temporary employer has been substituted for the old, which demonstration should include a show-

ing that a contract was made between the special employer and the employee, proof that the work being done was essentially that of the special employer, and proof that the special employer assumed the right to control the details of the work; failing this, the general employer should remain liable.

1C A. Larson, *The Law of Workmen's Compensation* § 48.14 at 8–420–22 (1986) (footnotes omitted).

peared "uncontrolled" is of no consequence.

In *Melancon v. Amoco Production Co.*, 834 F.2d 1238, *reh'g granted in part*, 841 F.2d 572 (5th Cir.1988), a case arising under LHWCA, but factually very similar to the case before this court and relied upon by both parties, the Court of Appeals for the Fifth Circuit discussed the issue of control as follows:

> In the case at bar, Amoco [the special employer] clearly had control over Melancon and his work: Melancon took orders only from Amoco personnel who told him what work to do and when and where to do it. Beraud [the general employer] gave no instructions to Melancon except to go to the Amoco field and perform the work requested by Amoco personnel.

*Id.* at 1245. Although the court in *Melancon* was applying federal, rather than Louisiana substantive law, this court finds its reasoning persuasive in this case. First, the facts in *Melancon* are very similar to those of the case at bar. Second, the factors and underlying principles applied by the *Melancon* court in deciding the borrowed servant issue are very similar to those applied by the Louisiana courts. In setting forth its ten-factor test, the Louisiana appellate court in *Brumbaugh* relied upon cases applying both Louisiana and federal law. In fact some of the cases relied upon by the *Brumbaugh* court included *West v. Kerr–McGee Corp.*, 765 F.2d 526 (5th Cir.1985) and *Ruiz v. Shell Oil Co.*, 413 F.2d 310 (5th Cir.1969), two LHWCA cases from which the court in *Melancon* derived its nine-factor borrowed servant formula. *See Melancon*, 834 F.2d at 1244; *Brumbaugh*, 507 So.2d at 875.

Defendant argues that—like defendant Amoco in the *Melancon* case—Cabgoc

clearly had the right to control Willis' work. Cabgoc points to the provision in its contract with Seco specifically providing that Cabgoc personnel would provide instructions to the Seco employees. A–52. Defendant also notes Willis' deposition testimony that Thomas Lee, a Cabgoc employee, was his direct supervisor on the platform. Willis Deposition I at 49.

Because the court did not adopt the "actual control" test upon which Willis relied, and in light of the court's holding denying summary judgment, plaintiff will be allowed to demonstrate at trial that Cabgoc did not possess the right to control his work on the platform.

*Obligation to Pay Wages (Factor 3)*

Willis asserts, and Cabgoc does not dispute, that he was at all times on Seco's—never Cabgoc's—payroll. Willis does not dispute, however, that Cabgoc paid a fee to Seco for his services.[11] Willis urges that since he remained on Seco's payroll, he was not Cabgoc's borrowed employee because Cabgoc was not responsible for paying his wages. Cabgoc argues that it effectively supplied his wages because it provided the funds from which Seco paid him.

Plaintiff is arguing form over substance. Ultimately, Cabgoc paid for the services it received from Willis and Willis received wages for performing Cabgoc's work. The fact that the funds passed through Seco and that Seco kept a portion of the fee paid by Cabgoc is a matter of mechanics and not substance. *See* 1C A. Larson, *supra* at § 48.30; *see also Melancon*, 834 F.2d at 1246 ("Amoco furnished the funds from which Beraud paid Melancon, and this is the determinative inquiry for this factor."). There is no genuine issue of material fact as to the mechanics of the monetary transactions between Cabgoc and Seco and Seco

---

**11.** The payment arrangements were described by defendant's attorney at oral argument:

> Here Seco is the person, the company that directly issued the check to Mr. Willis, the plaintiff. However, the contracts establish that he was paid on a daily basis a daily rate of pay, and Seco was paid by Cabgoc a daily rate of pay, which was then simply turned over to the plaintiff with a deduction for Seco's profit.

Transcript at 6–7. *See* A–53 ("CONTRACTOR shall invoice COMPANY on a monthly basis.... COMPANY shall pay CONTRACTOR in U.S. Dollars the amount as stated on the invoice....").

The contract between Cabgoc and Seco provided for a rate of pay of $460 per day for each day spent on the job site. A–56. Willis received $225 per day from Seco. A–57.

and Willis. The court holds as a matter of law that the fact that Cabgoc supplied funds from which Willis was paid is sufficient to satisfy the "obligation to pay" requirement and finds under Rule 56(d) that no triable issue remains as to this factor.

*Power of Dismissal (Factor 4)*

It is undisputed that Cabgoc had the right to require Seco to remove Willis from the platform at its request. It is also undisputed that Cabgoc did not have the right to terminate Willis' employment with Seco. Plaintiff urges that since Cabgoc could not "fire" him from Seco's employ, it did not have the power of dismissal necessary to achieve borrowing employer status.

Plaintiff again emphasizes form over substance. If Cabgoc had the right to terminate Willis' employment relationship with Seco, Willis would not only be a borrowed employee but an employee that had been given away. Requiring that a borrowing employer acquire the power to dismiss the employee from the lending employer's employ would eviscerate the borrowed servant doctrine, and this court declines to so hold. *See Melancon,* 834 F.2d at 1246 ("Amoco [the special employer] also had the right to discharge Melancon even though Amoco could not terminate Melancon's employment with Beraud [the general employer]. Amoco's right to terminate Melancon's services in the Amoco field satisfied this requirement") (citation omitted). There is no dispute that Cabgoc had the right to request that Seco remove Willis from the platform. In essence, Cabgoc could "give Willis back" to Seco. The court holds as a matter of law that Cabgoc had sufficient dismissal power to satisfy this factor and under Rule 56(d) that no triable issue remains as to this factor.

*Relinquishment of Control by the Lending Employer (Factor 5)*

A Louisiana appeals court in *Marzula v. White,* 488 So.2d 1092 (La.App. 2d Cir. 1986), held that the general employer (the defendant)

> retained some control over [its] employees. Defendant had the sole authority to fire these employees and they were in control of the manner in which these machines were operated.... Defendant was checking on the work being performed by his employees. If he had been dissatisfied with the manner in which they were functioning he could have given them new directions or terminated them. This fact shows that the employer-employee relationship between defendant and his employees was not suspended.

*Id.* at 1096.

Cabgoc notes that there was no Seco supervisor on its platform and that at most Seco exercised nominal control over Willis. Paraphrased slightly, the gist of Cabgoc's argument is that Seco never issued any instructions to Willis beyond "Go work for Cabgoc." Willis counters in his affidavit that

> at all times he worked aboard the Cabinda platform, he was in regular contact with a Seco Industries, Inc. employee and representative in Angola, Africa, relative to the various aspects of his employment by Seco Industries, Inc. aboard this platform, and relative to any problems which arose concerning that employment....

Affidavit of Richard Willis, attached to Plaintiff's Answering Brief (Dkt. 42) (hereinafter "Willis Affidavit"). He cites no examples of his consultation with Seco employees onshore. On the record before the court, therefore, all that is known is that no Seco representative supervised Willis on the platform, but there was a Seco representative in Angola with whom Willis regularly consulted.

Cabgoc urges that the affidavit conflicts with Willis' deposition testimony that he consulted with Thomas Lee when there was a problem on the platform. *See* Willis Deposition I at 49. Cabgoc argues Willis should not be permitted to create an issue of fact by contradicting his deposition testimony by affidavit, especially when the statement in the affidavit appears intentionally vague.

The court agrees the statement in the affidavit is ambiguous at best. Rule 56 requires the party opposing summary judgment to "set forth *specific* facts showing that there is a genuine issue for trial"

(emphasis added). The court notes further that problems concerning Willis' employment could relate to any aspect of employment including pay, benefits, vacation time, etc.—as well as aspects of his employment related to control of the details of his performance on the platform. If the affidavit were all that was in the summary judgment record, summary judgment would be granted on this factor.

However, there is additional evidence in the record which may indicate that Seco did not relinquish control over Willis. Thomas Lee in his deposition characterized the Seco–Cabgoc relationship as "owner-contractor." Lee Deposition at 13–15. He stated that Seco "was brought in as a contract operator" to operate machinery in the initial processing of oil. *Id.* at 14. The terms of the contract between Cabgoc and Seco and the course of performance as revealed in the record are arguably inconsistent with a principal-contractor relationship. Nonetheless, Lee's characterization, while not binding upon this court, is further supported by the fact that Willis supervised Cabgoc employees (the Angolan nationals) working on the platform. In a principal-contractor relationship, the contractor would retain control over its employees' work, and the principal would merely control the end result. Given the state of the record in this case—which largely consists of excerpts from various depositions taken out of context—the court finds there is a genuine issue of fact. At trial the relationship between the Seco personnel in Angola and plaintiff's work on the platform and whether Seco was a contractor may be more fully developed so as to determine whether Seco or Cabgoc exercised a right of control over plaintiff's work on the platform.[12]

*Agreement Between the Borrowing and Lending Employers (Factor 7)*

Cabgoc asserts that the contractual arrangement under which Seco supplied Cabgoc with technical personnel amply satisfies the requirement of an agreement between the two employers as to the lending of the employee. Willis notes the Seco–Cabgoc contract does not cover explicitly all nine factors and nowhere states that he was to be Cabgoc's borrowed employee. The contract refers to employees as "Contractor's [Seco's] employees"; however, there is a clause which states: "COMPANY shall designate person or persons to give instructions." A–52. Willis argues there is no evidence of a "meeting of the minds" or of the "state of mind" of Seco officials regarding the arrangement. Once again plaintiff argues form over substance. The "reality of the worksite and the parties' actions in carrying out the contract, however, can impliedly modify, alter, or waive ... contract provisions." *Melancon*, 834 F.2d at 1245. Seco was well aware that Willis would be performing Cabgoc's work on Cabgoc's platform taking directions from Cabgoc's employees. The court holds as a matter of law that the contract need not explicitly recite the ten factors nor refer to the borrowed servant doctrine to sufficiently demonstrate agreement between the two employers. *See Melancon v. Amoco Production Co.*, 834 F.2d 1238, 1245 (5th Cir.1988) (contract that did not specifically refer to borrowed employee status nevertheless evidenced sufficient agreement between the employers).

In light of the court's holding that plaintiff has raised an issue of fact as to whether the Cabgoc–Seco relationship was one of principal-contractor, however, plaintiff will be allowed to litigate the nature of the agreement between Cabgoc and Seco.

*Acquiescence by the Employee in the New Work Situation (Factor 10)*

Cabgoc argues that the contract between Seco and Willis, A–57–58, demonstrates Willis was aware that he was being hired to work on the Cabgoc platform. This, Cabgoc contends, is sufficient to show that Willis acquiesced in the arrangement. Willis stated in his affidavit that he considered himself an employee of Seco only and never

---

12. In so ruling, the court limits its discussion to the narrow issue under consideration in this motion, namely whether Willis was Cabgoc's borrowed employee. The court takes no position as to the effect on Willis' entitlement to tort damages and Cabgoc's status as his statutory employer should a principal-contractor relationship be found at trial.

considered Cabgoc his employer. Willis Affidavit. At oral argument he pointed out that he remained on Seco's payroll and received all benefits, including workmen's compensation benefits, from Seco. This court must first decide whether the test for determining acquiescence is subjective or objective. In other words, must the employee subjectively acquiesce or may his consent be implied from his conduct regardless of his subjective intent?

In determining acquiescence, one Louisiana court emphasized the employee's opportunity to evaluate the risks of the work situation and acquiesce thereto. *See Brumbaugh v. Marathon Oil Co.*, 507 So.2d 872, 875–76 (La.App. 5th Cir.1987) (quoting *Gaudet v. Amoco Production Co.*, 562 F.2d 351, 358, *reh'g denied*, 565 F.2d 1215 (5th Cir.1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. at 2254, 56 L.Ed.2d 414 (1978)) ("[W]as the employment with the new employer of such duration that the employee could be reasonably presumed to have evaluated the risks of the work situation and acquiesced thereto?"). The emphasis on the employee's *opportunity* to evaluate and acquiesce indicates an objective test for the employee's acquiescence.

In the case before this court, Cabgoc was responsible for the working conditions experienced by Willis and the risks therein. Transcript at 35–36; 37–38. Willis worked exclusively on Cabgoc's platform. Further, Willis worked on the platform for approximately three years—more than enough time for this court to presume his evaluation and acquiescence to the conditions on the platform. *See Brumbaugh*, 507 So.2d at 876 (two weeks was sufficient time for the court to presume evaluation and acquiescence in the risk).

Willis' acquiescence is further demonstrated by his knowledge prior to being hired that he would be working on the Cabgoc platform and on his taking direction from Cabgoc employees during the three years of his employment on the platform. It may be, however, given his characterization of the employment relationship as principal-contractor, that Willis will be able to show objective instances of conduct

demonstrating his nonacquiescence at trial. He will be given that opportunity.

*Seco Paid Willis' Worker's Compensation Benefits*

In addition to his arguments regarding the ten factors, Willis also urges that his status as Cabgoc's borrowed employee is somehow negated by the fact that Seco's insurance carrier paid his worker's compensation benefits. This argument, absent other considerations, is unpersuasive. It is well-established that if Willis is Cabgoc's borrowed employee, *both* Cabgoc *and Seco* would be liable to him for worker's compensation benefits: "[I]n a situation where there is a special and a general employer, both employers are bound solidarily to the injured employee, who may recover from either or both employers." *Smith v. Kelly Labor Service*, 239 So.2d 685, 688 (La.Ct. App. 4th Cir.), *writ denied*, 257 La. 173, 241 So.2d 531 (1970); *see also Maryland Casualty Co. v. Cowan*, 219 So.2d 530 (La. Ct.App. 3d Cir.), *writ denied*, 254 La. 455, 223 So.2d 867 (1969).

In this case, Seco and Cabgoc contractually provided that Seco would maintain worker's compensation coverage on the employees:

CONTRACTOR shall, at its sole expense, maintain in force at least the following types of insurance coverage during the period of this AGREEMENT:

A. Workmen's Compensation and Employer's Liability Insurance in accordance with the applicable statutes in the foreign country in which work is to be performed and the state of emanation [Louisiana]. The insurance is to include a Waiver of Subrogation in favor of COMPANY.

A–52. LSA–RS 23:1031 provides that "nothing in this section shall prevent any arrangement between the employers for different distribution, as between themselves, of the ultimate burden of such payments." Thus the agreement between Cabgoc and Seco as to who pays for compensation coverage is permitted by Louisiana law. Moreover, which party pays worker's compensation premiums or benefits is not one of the factors under Louisi-

ana law for determining borrowed employee status and therefore is irrelevant to the issue before the court.

## CONCLUSION

Defendant's motion for summary judgment on the issue of whether Willis was the borrowed employee of Cabgoc for purposes of the exclusive remedy provision under Louisiana worker's compensation law will be denied. The court finds under Federal Rule of Civil Procedure 56(d), however, that there is no genuine issue as to the following facts. These factors will be deemed established for trial and may not be relitigated:

(1) Seco selected and hired Willis;

(2) Cabgoc paid to Seco a fee for Willis' services. Seco in turn paid to Willis wages for the services he rendered on the Cabgoc platform. Functionally, Cabgoc provided the funds from which Willis was paid. This arrangement satisfies as a matter of law the requirement under the borrowed servant doctrine that Cabgoc as borrowing employer was obliged to pay Willis;

(3) Cabgoc's right to remove Willis from its platform was sufficient as a matter of law to satisfy the requirement that the borrowing employer have power of dismissal over the employee;

(4) Willis was performing Cabgoc's work at the time of the accident;

(5) Cabgoc furnished Willis with all necessary equipment and was responsible for conditions at his workplace, including the risks inherent therein; and

(6) Willis worked on the Cabgoc platform a sufficient length of time to make him Cabgoc's borrowed employee should the remaining factors be satisfied.

The court also resolves the following legal questions. The parties may present evidence as to the underlying facts at trial:

(1) The proper test for the "control" factor is whether Cabgoc had the *right* to control how Willis performed his work on the platform beyond mere control over the result. The parties may present proof as to Cabgoc's and/or Seco's right to control Willis' performance;

(2) The contract between Cabgoc and Seco need not enumerate the ten factors nor explicitly refer to the borrowed servant doctrine in order for Willis to be Cabgoc's borrowed employee. The nature of the agreement may be determined from the face of the contract and the course of the performance; direct evidence as to a "meeting of the minds" or "state of mind" is not required to find that Cabgoc and Seco intended for Willis to become a borrowed employee of Cabgoc. The parties may present evidence, such as course of performance, to demonstrate the nature of the agreement; and

(3) The test for Willis' acquiescence of the work environment on the Cabgoc platform is objective, and Willis' acquiescence may be implied from his conduct. The parties may present evidence of Willis' conduct demonstrating or negating his acquiescence in an employment relationship with Cabgoc.

Finally, there remains a genuine issue of fact for trial as to whether Seco relinquished control over Willis' daily work performance. At trial the parties may present evidence demonstrating the nature of the relationship between Seco's personnel in Angola and Willis' work on the platform and whether Seco was a contractor.

Summary judgment will be denied, and the court will enter an order under Federal Rule of Civil Procedure 56(d) in conformity with the findings of this opinion.