588 So.2d 1251 (1991)
Charles J. FANGUY and Betty Fanguy
v.
DUPRE BROTHERS CONSTRUCTION COMPANY, INC. and Bennett Fracella.
No. CA 90 1872.
Court of Appeal of Louisiana, First Circuit.
October 18, 1991.
Rehearing Denied January 3, 1992.
*1253 Joseph L. Waitz, Houma, for plaintiffs and appellants Charles and Betty Fanguy.
Robert A. Redwine, New Orleans, for defendants and appellants North Star Agency, Inc. and Julius F. Eirich, Jr.
Robert L. Picou, Jr., Houma, for defendant and appellee Dupre Bros. Const. Co., Inc.
Michael L. McAlphine, New Orleans, for defendant and appellee Ocean Marine Indemn. Co. & Underwriters at Lloyd's.
Michael J. Maginnis, New Orleans, for defendant and appellee National Union Fire Ins. Co. and co-counsel Peter L. Hilbert, Jr.
Before EDWARDS, LANIER and GONZALES, JJ.
EDWARDS, Judge.
This is a tort action brought under general maritime law and 33 U.S.C.A. § 905(b), which arose following a personal injury suffered by plaintiff, Charles J. Fanguy, on July 22, 1986. Suit was filed by Mr. Fanguy and his wife, Betty Fanguy, on August 12, 1987, against: Dupre Brothers Construction Company, Inc. (hereinafter "Dupre"), the owner of the barge where the injury occurred; National Union Fire Insurance Company of Pittsburgh, Pennsylvania (hereinafter "National Union"), the general liability and employer liability carrier for Dupre; Gulf Coast Marine, Inc. (hereinafter "G.C.M."), Lloyd's of London Underwriters (hereinafter "Lloyd's")[1], the protection and indemnity ("P & I") carriers for Dupre; Bennett Fracella, an employee of Dupre; and Julius F. Eirich, Jr., and North Star Agency, Inc. (hereinafter "Eirich" and "North Star"), the insurance agent and agency, respectively, for Dupre. Dupre filed third-party demands against all of its co-defendants. Motion for Summary Judgment was granted by the trial court on February 14, 1989, in favor of and dismissing National Union[2], in its capacity as employer liability carrier. Following trial on February 21-23, 1989, the matter was taken under advisement and judgment was rendered on May 31, 1990, in favor of Charles Fanguy and in favor of Betty Fanguy against Dupre, Eirich and North Star, in solido, for $411,768.90 and $9,000.00, respectively, with legal interest and costs.[3] *1254 Additionally, the court rendered judgment in favor of Dupre on its third-party demand against Eirich and North Star for all sums Dupre has been obligated to pay to plaintiffs on the main demand. Judgment was also rendered in favor of National Union, G.C.M., and Lloyd's, dismissing both the main demand and the third-party demand.
Eirich and North Star suspensively appeal the trial court judgment and make the following assignments of error alleging trial court error in:
(1) refusing to consider the applicability and effect of Louisiana's worker's compensation laws;
(2) concluding that plaintiff does not qualify for protection under the federal Longshore and Harbor Worker's Compensation Act;
(3) concluding that the general liability policy excluded coverage;
(4) refusing to consider parol evidence regarding the intent of the parties to the P & I policy and mistake as to the coverage to be afforded by that policy;
(5) concluding that North Star breached its duty to notify Dupre of a gap in coverage of the P & I policy;
(6) concluding that Dupre carried its burden of showing resulting damage in North Star breached its duty to notify of a gap in coverage;
(7) concluding that Dupre's crane operator breached a duty of reasonable care to plaintiff;
(8) ignoring unanimous medical testimony of prior lumbar disability which was not aggravated by this accident;
(9) making awards for loss of earning capacity, for permanent disability, and for past and future pain, in light of plaintiff's refusal of surgery;
(10) awarding past medicals for unrelated charges which were not identified and excluded from related charges;
(11) casting North Star in liability to plaintiffs;
(12) attributing only ten percent comparative fault to plaintiff; and
(13) discounting plaintiff's economic loss only to fortuitous trial date rather than to the date of the accident when the economic loss began.
Plaintiffs have filed a devolutive appeal[4] seeking to have the trial court find insurance as to the dismissed insurers, in the event North Star is successful in its appeal. G.C.M. and Lloyd's filed an answer to the appeal of North Star, asking that the trial court judgment be affirmed.

FACTS
Plaintiff Charles Fanguy has worked as a self-employed high pressure pipeline welder for 21 years, doing work for contractors and oil companies as Charles Fanguy Welding Service. At the time of the incident which led to this suit, he had just completed a job for Dupre which involved laying two pipelines and hooking up two high pressure wells for Linder Oil Company. The job site was located at Bateman Lake, south of Morgan City, Louisiana, out of the Atchafalaya Basin. Plaintiff worked from a crane barge owned by Dupre, the Gulf FAB 112, which had been loaded with both his own and Dupre's equipment at the dock in Dulac and towed by tug to the job site, where it remained until the job was completed in approximately 2 to 2½ weeks.
Mr. Fanguy testified without contradiction that the six workers, including himself, involved in the job were transported to and from the barge each day by crewboat. He stated that he completed his portion of the job on July 16, 1986. After completion of the job, when the barge had returned to the dock at Dulac, he was telephoned by one of the owners of Dupre and asked to pick up his equipment on July 22, 1986, at 6:00 a.m. Mr. Fanguy was injured that day when he boarded the barge to retrieve his equipment.
*1255 In his written reasons for judgment, the trial judge made the following findings of fact:
When Fanguy arrived Bennett Frisella [sic], Dupre's crane operator, was preparing to off load pipe from the barge with help from Benny Brown, another Dupre employee. Fanguy boarded the barge and engaged in some small talk with Brown and Frisella [sic]. When the conversation ended Fanguy proceeded to walk toward the "dog house", a shed where some of his equipment was stored. The route to the shed took Fanguy from the left side of the crane straight down the left side of the barge and eventually in front of the crane. Frisella [sic], in the meantime, proceeded to pull a 25 foot length of pipe from under the crane in preparation to off load it. The pipe had already been hooked to the crane line prior to Fanguy's arrival. In order to complete the maneuver, Brown hooked the crane line to a pad eye on the pipe. Frisella [sic] dragged the pipe straight out from under the crane. When the pipe cleared the crane, Frisella [sic] then began to pull up the crane's boom. When the pipe was almost vertical and the back end of the pipe still dragging the deck of the barge, the back end of the pipe struck a sheave. The contact with the sheave caused the pipe to unhook from the crane line, fall and strike the plaintiff on the head and back.
The trial judge found that the injuries suffered by the plaintiff as a result of this accident included a head laceration, damage to six teeth, two ruptured cervical discs which had required surgery, and an exacerbation of a pre-existing degenerative lumbar condition which will require surgery, and assessed damages as follows:

Past and Future Pain and
Suffering $125,000.00
Past Medical Expenses 14,521.00
Future Medical Expenses 8,000.00
Loss of Past and Future
Earnings and Earning Capacity 260,000.00
Permanent Disability 50,000.00
 TOTAL $457,521.00

Additionally, as noted above, he awarded $10,000.00 for loss of society, services and consortium to Betty Fanguy, who had to return to work after the accident for the first time in her 24-year marriage to plaintiff, and reduced all awards by 10 percent, the percentage of comparative fault he assigned to Charles Fanguy.

NO RIGHT OF ACTION
Subsequent to the filing of the suspensive appeal by North Star and Eirich which raised the issue of North Star's liability to the plaintiffs, plaintiffs filed in this court on December 13, 1990, a peremptory exception raising the objection of no right of action "to the arguments made before this Honorable Court by North Star Insurance Agency and Julius F. Eirich, Jr. ..."
We note that this is an improper use of an exception. LSA-C.C.P. art. 921 defines an exception as "a means of defense, other than a denial or avoidance of the demand, used by the defendant, whether in the principal or an incidental action, to retard, dismiss, or defeat the demand brought against him." (Emphasis added.) LSA-C.C.P. art. 923 states, in pertinent part, that "[t]he function of the peremptory exception is to have the plaintiff's action declared legally nonexistent, or barred by effect of law, and hence this exception tends to dismiss or defeat the action." (Emphasis added.) Finally, LSA-C.C.P. art. 927(5) lists as one of the objections which may be raised by the peremptory exception, "[n]o right of action, or no interest in the plaintiff to institute the suit." (Emphasis added.)
Defendants except to petitions of plaintiffs, either in the main demand or in an incidental action; plaintiffs cannot except to defenses by defendants. The plaintiffs are improperly using an exception to challenge a defense by defendants. Thus, we overrule the Fanguys' peremptory exception raising the objection of no right of action.
Even if we were not overruling this exception on procedural grounds, we would do so based on substantive grounds. In arguing their objection, plaintiffs concede that the judgment granted in their favor against North Star and Eirich was contrary *1256 to the holding of LeBouef v. Colony Insurance Company, 486 So.2d 760 (La.App. 1st Cir.1986). In LeBouef, this court held that a tort victim has no right of action against an insurance agent for negligence resulting in inadequate insurance coverage to the tortfeasor. 486 So.2d at 761.
Plaintiffs argue that "since it [LeBouef] applies for them [North Star and Eirich], it should apply against them," and ask this court to dismiss all issues on appeal between North Star, Eirich, and themselves. We find no merit in this argument. Since Dupre filed no answer or appeal regarding the judgment on the main demand against Dupre, that judgment is final. LSA-C.C.P. art. 2133. However, in view of LSA-C.C.P. art. 1115, which provides that a third party defendant may assert against the plaintiff in the principal action any defenses which the third party plaintiff has against the principal demand, it is necessary to review the issues presented in the trial court, although the judgment against Dupre cannot be changed. Breaux v. Rimmer & Garrett, Inc., 320 So.2d 214 (La. App. 3d Cir.1975). If North Star and Eirich are successful in their arguments that judgment was improperly awarded against Dupre under applicable tort law and/or that insurance coverage existed for Dupre's liability, then appellants will be entitled to have the judgment against them and in favor of Dupre reversed. Therefore, appellants' assignment of error number eleven has merit, and that portion of the trial court judgment in favor of plaintiffs and against North Star and Eirich is reversed. Plaintiffs' peremptory exception raising the objection of no right of action is overruled.

STATUS UNDER LHWCA
North Star and Eirich assign as error the trial court's finding that plaintiff does not qualify for coverage under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. 901 et seq. They contend that Mr. Fanguy should be deemed covered under the LHWCA under any or all of the three ways in which a worker qualifies for LHWCA coverage: (1) that he is a regular employee under section 904(a); (2) that he is an employee of a subcontractor which has not obtained its own compensation insurance; or (3) that he is a borrowed employee under section 905(b). They cite Melancon v. Amoco Production Company, 834 F.2d 1238 (5th Cir.1988), and Capps v. N.L. Baroid-NL Industries, Inc., 784 F.2d 615 (5th Cir.1986), cert. denied, 479 U.S. 838, 107 S.Ct. 141, 93 L.Ed.2d 83 (1986), in support of their arguments.
Mr. Fanguy's unrebutted testimony was that he had done occasional work for Dupre over the past five years, approximately fourteen to sixteen jobs, which were brief in duration. He stated that during that same five-year period, he performed high pressure welding such as he did on this job for Dupre for approximately thirty to seventy companies, some of whom were no longer in existence because of economic conditions in the oilfield industry. With regard to the Dupre jobs, he had previously worked from this same barge and with this same crane a number of times; but in any event, all of his work for Dupre had been conducted on a barge, never on land. Plaintiff testified that he took his orders from the Dupre foreman as to what work needed to be done in what order, but performed it on his own with his own welding equipment, and that he could direct another Dupre crewman to assist him.
The trial court granted a motion for summary judgment filed by National Union Fire Insurance Company of Pittsburgh, Pennsylvania, in its capacity as Dupre's employer liability carrier, holding that Mr. Fanguy was not an employee of Dupre. His reasons for judgment were as follows:
In granting the motion of the LHWC carrier, the Court finds that the plaintiff was not an employee of Dupre Brothers at the time of his accident. Fanguy, the Court finds, was an independent contractor who serviced many other companies other than Dupre Brothers in a catch as catch can business. For over twenty years Fanguy has been a self employed welder under the auspices of Charles Fanguy Welding Service, a sole proprietorship. In his contacts with Dupre *1257 Brothers, he was usually contracted for special welding jobs much like the last job before his injury as a high pressure pipeline welder. He keeps daily work sheets during each job and fills out an invoice at the end of each job. Dupre Brothers withheld neither State nor Federal taxes and all of his income tax returns were filed under the name of Charles Fanguy Welding Service. Further, Fanguy provided all of his own tools and equipment to fulfill his contractual obligations and it was his attempt to retrieve those very tools that resulted in his injury. The Court further finds that considering the factors set forth in Caps [sic] v. N.L. Baroid-N.L. Industries, Inc., 784 F.2d 615 (CA 5th Cir.1986) Fanguy was not a borrowed employee of Dupre Brothers. Because Fanguy had terminated his relationship with Dupre Brothers, with reference to the job that commenced on June 16, 1986 some weeks[[5]] before the accident, reinforces the Court's position that there was no employer/employee relationship at the time of the accident. The Court is certain, under these factual circumstances, there was never an employer/employee relationship, and even if there had been, it had terminated by the time this accident occurred.
In view of plaintiff's brief and intermittent associations with Dupre and numerous other companies, his method of operation for this job, his provision of his own welding equipment, his submission of an invoice to Dupre at the completion of the job and Dupre's failure to withhold taxes, as well as the other details supported by the record, we find that the trial judge was factually and legally correct in holding that Mr. Fanguy was not an employee of Dupre, borrowed or otherwise.[6] The issue of whether a borrowed servant relationship existed is a matter of law for the court to determine. Melancon, 834 F.2d at 1244; Capps, 784 F.2d at 617. There are, however, nine separate factual inquiries underlying "borrowed employee" status, and a district court's factual findings will not be upset unless they are clearly erroneous. Melancon, 834 F.2d at 1244. Although the trial judge did not make express written findings under all nine factors[7] for determining borrowed employee status under Melancon and Capps, he stated that he considered these factors; and since his stated findings and ultimate conclusion are not clearly erroneous (manifestly erroneous or clearly wrong), we will not upset them. See, Melancon, at 834 F.2d 1244; Rosell v. ESCO, 549 So.2d 840 (La.1989).
This assignment of error has no merit.

DUPRE'S DUTY OF REASONABLE CARE
North Star and Eirich argue that it was error for the trial court to conclude that Dupre's crane operator breached a duty of reasonable care to the plaintiff. They correctly state that the applicable law is maritime law even though this litigation is in a state court, and that the standard of *1258 care is "reasonable care under the circumstances of each case." Kernarec v. Compagnie Generate Transatlantique, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1958).
The trial court's findings on this issue were as follows:
Frisella [sic] testified, and the Court recognized his sincerity, that it was a fairly frequent occurrence for pipes to fall. Frisella [sic] also testified that it was his responsibility to make sure the way was clear to make the lift safely.
Further, Frisella [sic] testified that it would not have taken any more time to secure the pipe with a shackle tha[n] with the [h]ook he actually used. A shackle would have safely prevented this type of accident from occurring at all. If properly shackled the pipe presumably would have withstood most jarring without falling. Frisella [sic] could have and should have secured the pipe with a shackle for it was no less time consuming than the method he used. Frisella [sic] himself said falling pipe was a common occurrence in his line of work. He was aware of the danger; he could have prevented it by use of the shackle; and he was derelict in his duty to make sure the way was clear to make the lift. Therefore, the Court finds that Frisella [sic] was negligent and his negligence was a causative factor that precipitated the injuries sustained by the plaintiff.
We cannot say that the trial court was manifestly erronous in his factual findings, as the testimony below clearly included the details relied upon by the trial judge in his written reasons for judgment, or that he erred in concluding that Dupre's crane operator breached the duty of reasonable care owed to Mr. Fanguy under these circumstances.
This assignment of error has no merit.

COMPARATIVE FAULT OF PLAINTIFF
Appellants North Star and Eirich contend that the trial court erred in assigning only ten percent comparative fault to plaintiff. They argue that he should be deemed at least fifty percent at fault for the accident because he knowingly placed himself in a position of danger when he left the side of the crane, a position of safety, and began walking along the side of the barge towards the shed where his tools were, just as Bennett Fracella was beginning to lift the pipe. They point to apparently conflicting testimony by plaintiff at trial from his testimony during a deposition which focused on his awareness of Fracella's actions as the crane operator.
After hearing all the testimony on whether Mr. Fanguy was aware that Fracella was in the process of lifting the length of pipe, or even whether he knew that the pipe was already hooked to the crane, the trial judge assigned the following in his written reasons:

COMPARATIVE NEGLIGENCE OF PLAINTIFF
Frisella [sic] testified that he told the plaintiff that he intended to finish unloading the pipe before unloading the plaintiff's tools. He further testified that plaintiff could easily see that the pipe was already hooked up to be unloaded. Plaintiff testified that he did not know the pipe was hooked up but undoubtedly he heard the crane as the unloading began. Though the apparent awareness by the plaintiff of Frisella's [sic] actions does not exculpate Frisella [sic] and Dupre Brothers, it does support some negligent action on the part of the plaintiff. Therefore this Court finds that the plaintiff was 10% at fault in causing his injuries.
It is evident from these statements by the trial judge that he evaluated the conflicting testimony, determined the credibility of the respective witnesses and their testimony, and made a factual finding as to plaintiff's level of knowledge of the conditions aboard the barge at the time of the accident. After a thorough evaluation of the record, we find no manifest error in this factual determination by the trier of fact, and accord it the great deference required by Rosell v. ESCO, 549 So.2d 840 (La.1989). Likewise, with regard to the percentage of fault assessed to the plaintiff by the trial court, and mindful of the guidelines discussed by *1259 our Supreme Court in comparing the relative degrees of fault to be assigned to each party in Dobson v. Louisiana Power and Light Company,[8] 567 So.2d 569 (La.1990), we affirm the district court's conclusion that the negligence of Fracella and Dupre was greater than that of Mr. Fanguy.
This assignment of error has no merit.

QUANTUM
Several of the assignments of error by North Star and Eirich focus on the damages awarded to the plaintiff by the trial court. The first of these is that the trial judge erred in "ignoring unanimous medical testimony of prior lumbar disability which was not aggravated by this accident." Appellants contend that both Mr. Fanguy's own treating physician and their expert, who examined the plaintiff for purposes of trial, unanimously stated that plaintiff's lumbar back problems were not causally related to the accident because he had prior lumbar problems in 1981 which were identical to his problems after the accident. This characterization of the testimony by plaintiff's physician is not entirely accurate.
Dr. William Kinnard, whose expertise as a board certified orthopedic surgeon was stipulated by all parties, first saw plaintiff for the injuries arising from this accident some ten months after the accident, on June 26, 1987. Mr. Fanguy had attempted to resolve his discomfort through chiropractic care after the accident without success before seeking treatment from Dr. Kinnard. Dr. Kinnard testified that a CAT scan performed on July 7, 1987, revealed a bulging disc at C4, a bone spur at C5, and a bone spur and bulging disc at C6 in plaintiff's cervical spine. He therefore performed an anterior cervical diskectomy and fusion at both C5 and C6, or a double level cervical fusion, on or about August 10, 1987, after which Mr. Fanguy's cervical problems were resolved and he became basically asymptomatic.
With regard to plaintiff's lumbar problems, Dr. Kinnard testified that he had seen plaintiff prior to this accident on November 24, 1980, for complaints about his lower back. Dr. Kinnard stated that the history given him by the plaintiff on that date was that Mr. Fanguy had twisted his back while playing softball. A CAT scan performed on March 18, 1981, revealed no disc abnormalities ("... the impression by the radiologist was a normal CAT scan of the lower back at that time"), although Dr. Kinnard found some evidence of decreased ankle jerk on the right, which he stated indicated some nerve root pressure at the L5 disc space level. Mr. Fanguy was not hospitalized or treated after March of 1981 until after the 1986 accident.
Dr. Kinnard stated that a CAT scan of the lumbar spine taken in June, 1987, showed evidence of degenerative changes secondary to some wear and tear, including bone spurs that caused some narrowing of the neuroforamina. He defined the latter as the little canals where the nerves exit, and opined that this narrowing can put that level at risk of being injured by some other incident. He concluded that if plaintiff had been asymptomatic or had worked from March, 1981, until this accident and thereafter had problems or pain, such a blow and fall could cause this problem to be symptomatic. While acknowledging the degenerative changes noted in Mr. Fanguy, Dr. Kinnard related the accident to plaintiff's lumbar spine as "an aggravation of a pre-existing condition."
On cross-examination, Dr. Kinnard admitted that the type of symptoms which plaintiff had after the accident were the same as those he exhibited in 1981, and that the aging process and Mr. Fanguy's *1260 heavy manual labor would worsen his symptoms. However, he expressly refused to agree that Mr. Fanguy would have needed surgery even without the accident; he stated:
You keep asking over and over and trying to get me to say that he would have definitely worsened and I can't say that, because I don't know that for a fact. Because I do have people that do improve in spite of the x-ray findings.
The trial judge noted the testimony of Dr. Chris Cenac, another board certified orthopedic surgeon who testified on behalf of one of the defendants, who disagreed with Dr. Kinnard's opinion. Dr. Cenac felt that the plaintiff's lumbar complaints were unrelated to the accident, and were instead attributable to the degenerative changes that were ongoing since 1981. However, the trial court found "[t]hough it is most likely that the plaintiff had a continuing worsening condition since 1981, it [is] more likely than not the fall exacerbated the condition."
We are unable to say that the trial judge was manifestly erroneous in resolving the conflicting expert testimony in favor of plaintiff's expert, as Dr. Kinnard's reasons were not patently unsound. See, Lirette v. State Farm Insurance Company, 563 So.2d 850 (La.1990). Therefore, this assignment of error has no merit. Likewise, appellants' argument that the "stipulated" medical expenses of the plaintiff contained unrelated charges, which pertained to his lumbar condition, has no merit in view of our affirmation of the trial court's finding that the lumbar condition was aggravated by the accident.
The next argument raised by North Star and Eirich is that the trial judge erred in awarding damages to plaintiff for loss of earning capacity, permanent disability, and past and future pain and suffering, in view of plaintiff's refusal of surgery. However, the record provides an adequate basis to support awards for these items. While it is undisputed that the plaintiff was scheduled for surgery and cancelled it, and that he testified that he was afraid of surgery, he also testified that "I will have it done. There's no doubt in my mind that I'll have lower back surgery. It's just a matter of when." Additionally, Dr. Kinnard testified that he was prepared to perform the surgery on Mr. Fanguy "[w]hen he gets to the point where it's intolerable...," stating "If Plan A, which is conservative fails, then we go to Plan B." Obviously, Dr. Kinnard did not feel that plaintiff's cancellation of surgery was an unreasonable choice at that point in time, or that he was unnecessarily prolonging or worsening his condition.
With regard to the award for permanent disability, it was also undisputed that since the accident, Mr. Fanguy had been and would be unable ever to return to his former occupation as a high pressure welder. Both Dr. Kinnard and Dr. Cenac were of the opinion that Mr. Fanguy could not do so; Dr. Kinnard assigned a twenty percent whole body impairment to Mr. Fanguy as a result of his cervical and lumbar conditions. In making his award for loss of earning capacity, the trial judge stated that he was taking into consideration that Mr. Fanguy would be able to earn minimum wage.[9] We find no manifest error in the factual findings of the trial court, and no abuse of discretion in the amounts awarded.[10]
These assignments of error have no merit.

*1261 COVERAGE UNDER THE GENERAL LIABILITY POLICY
Appellants contend that it was error for the trial court to find no coverage for this incident under the terms of the comprehensive general liability policy based on its exclusion regarding watercraft. Their argument is that because the policy does provide coverage for the crane as "mobile equipment," the watercraft exclusion at worst poses an ambiguity in coverage, which should be interpreted against the insurer. They cite the case of Lee v. Liberty Mutual Insurance Co., 387 So.2d 621 (La.App. 4th Cir.1980) for the proposition that where liability arises from two sources, the fact that one source is excluded does not render coverage of the other source ineffective.
The policy contains the following exclusionary language:
This insurance does not apply:

. . . . .
(e) to bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of
(1) any watercraft owned or operated by or rented or loaned to any insured, or
(2) any other watercraft operated by any person in the course of his employment by any insured;
but this exclusion does not apply to watercraft while ashore on premises owned by, rented to or controlled by the named insured;
The trial court found that the policy in question did provide coverage for the use of cranes except when they were used in conjunction with a vessel, stating, "The case of the crane for unloading watercraft was plainly and unambiguously excluded." We agree.
The case cited by North Star and Eirich, Lee, is not factually apposite to the case at bar, as appellants contend. In that situation, the plaintiff was attempting to repair his dump truck, not to load or unload it, with the help of a front end loader and its operator. The front end loader was being used to lift the tailgate of the dump truck, which had fallen off, so that it could be reattached to the back of the truck. The policy therein clearly excluded bodily injury arising out of the maintenance of an insured's automobile, the definition of which included the dump truck, but included coverage for the use of mobile equipment, which included the front end loader. The court there noted that the tailgate was not on the truck, the excluded entity when it fell on the plaintiff; it fell from the front end loader. The plaintiff was thus one step removed from the dump truck when he was injured, and an ambiguity in coverage thus existed.
In the case sub judice, there is no question but that both the pipe and the plaintiff were physically on and in contact with the barge, as the plaintiff was standing on the barge while the pipe was being lifted by the crane, itself bolted to the barge, with one end of the pipe in the air and the other on the deck. Indeed, because one end of the pipe struck an obstruction on the deck as it was being moved, it fell from the hook. The plaintiff, the crane, and the pipe were undeniably encompassed within the exclusionary language "... arising out of the ... loading or unloading of (1) any watercraft owned or operated by or rented or loaned to any insured...." Thus, we find the case cited by appellants distinguishable.
This assignment of error has no merit.

THE PROTECTION AND INDEMNITY POLICY
Appellants raise several assignments of error in connection with the trial court's rulings regarding the protection and indemnity policy issued by Ocean Marine Indemnity Company Treaty 1985, Roger Keith Larkin, as nominee for and on behalf of Certain Underwriters at Lloyd's of London, and Institute of London Underwriters Companies, underwritten by their broker, Gulf Coast Marine, Inc. They contend that there was error in the trial judge's rulings (1) refusing to consider parole evidence regarding the intent of the parties to the P & I policy and mistake as *1262 to the coverage to be afforded by that policy; (2) concluding that North Star breached its duty to notify Dupre of a gap in coverage of the P & I policy; and (3) concluding that Dupre carried its burden of showing resulting damage if North Star breached its duty to notify of a gap in coverage.
The policy in question explicitly refers to an exclusion of coverage for draglines in two places. The first occurs in the portion of the policy dealing with hull coverage, wherein permission is granted for the placement of draglines (and cranes) on the barges. This language is as follows:
Permission is hereby granted to install aboard the vessel(s) insured hereunder dragline(s), crane(s), pile driver(s) or similar equipment and its appurtenances and the fuel for the operation of such dragline(s), crane(s), pile driver(s) or similar equipment. However, this policy excludes and does not cover said dragline(s), crane(s), pile driver(s) or similar equipment, its appurtenances nor the fuel for its operation. [Emphasis added.]
The second place is in the section of the policy which provides the protection and indemnity coverage, and the exclusion states:
No liability hereunder shall attach in respect of claims arising out of the operation of any dragline(s), crane(s), pile driver(s) or similar equipment being located and/or operated aboard the vessel(s) named herein.
With respect the "LITTLE DAVID" and "GULF FAB112"
The trial judge's findings on the issue of the crane exclusion were as follows:
Though the entire business of Dupre consists of using cranes and draglines in laying pipelines and other general construction and, in light of the fact that most of Dupre's work is over water, using the cranes and draglines on barges, the policy contains a crane and dragline exclusion. This is so even though the policy expressly gives Dupre permission to put cranes on covered vessels. However, the exclusion is plain and unambiguous....
The Court cannot conceive that Dupre would not secure coverage of the cranes in question given the nature of its business. However, the exclusion is plain and unambiguous. The plaintiff argues that the policy is ambiguous in that it covers unseaworthiness, which would include negligence of a crew member, and excludes use of a crane by that crew member. However, plaintiff did not adequately prove an unseaworthiness claim, i.e. showing by a preponderance of the evidence that Frisella [sic] was a permanent member of the crew of a covered vessel or fleet of vessels. Even if Frisella [sic] was proven to be a member of the crew of the Gulf FAB 112, the Court would find there was no coverage because that one act, using the crane, was unambiguously excluded as opposed to other acts that are not excluded from coverage.
The trial court further found that there was no mistake of fact between the underwriters and Dupre. The record supports this finding, as at no time was it ever suggested that the underwriters and Dupre ever had contact. All of the dealings with the underwriters were conducted by Eirich and North Star on behalf of Dupre.
Appellants' suggestion that there was mistake of fact between Eirich/North Star and the underwriters was addressed by the trial judge in his reasons in this manner:
In January, 1986, Eirich wrote a letter to Gulf Coast Marine, and [sic] insurance broker, and requested coverage that duplicated Dupre's 1985 policy. The 1985 policy would have covered the cranes and their use. During discussions with the broker, namely William Kemp, the crane exclusion was brought up and in Eirich's opinion the exclusion only pertained to property damage caused by the crane. Kemp testified, and it was substantiated by Eirich, that the policy would be the same as another of Eirich's clients, Goo-Ken. The Goo-Ken policy contained the crane exclusion. Eirich testified that it did not matter whether Goo-Ken had a *1263 crane exclusion for other reasons. Eirich was put on notice at that point as to the exclusion. And as he testified this was not relayed to Dupre.
North Star contends that this was the only carrier that would insure Dupre for P & I and Hull. Notwithstanding the speculative nature of that conclusion in light of testimony that not all possible brokers were contacted, the fact remains that Dupre was exposed to a risk it fully believed was covered. Eirich knew or should have known, whether actually or by mistake, that the risk was not covered and that information should have been passed on to his client and he was negligent in failing to do so.
We find no manifest or legal error in the trial judge's holdings. The record contains extensive testimony on these points which were concisely summarized in the court's written reasons. The conclusions therein regarding Eirich's understanding of the exclusionary language were a determination of credibility by the trier of fact of conflicting testimony by William Kemp and Julius Eirich, and as such, are entitled to great deference. As stated in Rosell v. ESCO, 549 So.2d at 845, where "a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong."
Finally, with regard to the contention that Dupre did not carry its burden of showing resulting damage, even assuming that North Star breached its duty of notification, appellants are mistaken as to the nature of Dupre's burden of proof. The cases[11] cited by appellants as requiring a showing that Dupre would have been able to obtain insurance elsewhere all involve parties who were for various reasons, uninsurable (e.g. a thoroughbred with a pre-existing condition, a terminal cancer patient). There is nothing in the record to support the inference that Dupre was uninsurable; the testimony by Eirich was that he had difficulty finding coverage for Dupre because of one previous claim based on Dupre's liability, that the market at that time was unfavorable, and that he did not have access to all the markets. As the trial judge noted, the fact remains that Dupre was exposed to a risk it fully believed was covered, as previous years' policies had covered crane operations, and Dupre relied on Eirich, who had knowledge of the nature of their operations, to procure the necessary coverage for their business. Dupre continued its operations in the belief that every facet of its activities was insured. Under these circumstances, the trial court's finding of liability on the part of Eirich and North Star was correct.
These assignments of error have no merit.

CONCLUSION
For the above reasons, that portion of the judgment of the district court in favor of plaintiffs Charles J. and Betty Fanguy and against Julius F. Eirich, Jr., and North Star Agency, Inc., is reversed. In all other respects, the judgment of the district court in favor of Charles J. and Betty Fanguy and against Dupre Brothers Construction Company, Inc., in the amounts of $411,768.90, and $9,000.00, respectively, together with legal interest from date of judicial demand and for all court costs, is affirmed. Likewise, the judgment in favor of Dupre Brothers Construction Company, Inc., as third party plaintiff, and against Julius F. Eirich, Jr., and North Star Agency, Inc., for all sums which third party plaintiff is obligated to pay on the main demand, and the judgment dismissing all other claims and demands, is affirmed. The peremptory exception raising the objection of no right of action is overruled.
Costs of this appeal are assessed against appellants Julius F. Eirich, Jr., and North Star Agency, Inc.
*1264 EXCEPTION OVERRULED; AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
GONZALES, J., concurs in part, dissents in part and assigns reasons.
LANIER, J., concurs. I do not agree with the treatment of the assignment of error pertaining to status under the LHWCA.
GONZALES, Judge, concurring in part, dissenting in part.
I concur in the judgment of the majority insofar as the peremptory exception raising the objection of no right of action filed by defendants, Julius F. Eirich, Jr., and North Star Agency, Inc., is sustained, and the peremptory exception pleading the objection of no right of action filed by plaintiffs is overruled. I respectfully dissent from the majority opinion and disagree with that portion of the opinion which finds that Dupre was not a statutory employer entitled to tort immunity. It is my opinion that under the test enunciated by the Fifth Circuit in Melancon v. Amoco Production Co., 834 F.2d 1238 (5th Cir.1988), amended, 841 F.2d 572 (5th Cir.1988), Mr. Fanguy was a borrowed employee of Dupre. Furthermore, I believe that Dupre was not exempt from tort immunity under 33 U.S.C.A. § 905(b) because he was injured while performing stevedoring work which was caused by the negligence of a person providing stevedoring services, a situation excluded from a 905(b) action. Durr v. Global Marine, Inc., 673 F.2d 740 (5th Cir.1982). See also Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983); Smith v. M/V Captain Fred, 546 F.2d 119 (5th Cir. 1977). Accordingly, I would reverse the judgment of the trial court with respect to appellants, North Star Agency, Inc. and Julius F. Eirich, Jr.
NOTES
[1] William Kemp, the vice president of Gulf Coast Marine, Inc. testified at trial that Gulf Marine, Inc., is the managing general agent for the insurance companies providing "P & I" coverage to Dupre; these insurance companies answered suit as "Robert Keith Larkin, as nominee for and on behalf of Certain Underwriters at Lloyd's, London, severally subscribing each for its own part only and not one for another, each in his individual proportion only, to a certain policy of Protection & Indemnity Insurance as evidenced by Policy No. GCM86038 (hereinafter referred to as Certain Underwriters at Lloyd's London)...."
[2] National Union remained a defendant as the comprehensive general insurer of Dupre.
[3] The trial court found plaintiffs had suffered damages in the amounts of $457,521.00 and $10,000.00, respectively; however, the court assigned Mr. Fanguy ten percent contributory fault and reduced both awards accordingly.
[4] On August 23, 1990, a partial dismissal of plaintiffs' appeal was granted on their motion. Plaintiffs stated that since Dupre had taken no appeal, "all issues between plaintiffs ... and Dupre ... are now moot and academic, there being no need to appeal." Plaintiffs reserved all other rights under their appeal.
[5] Although the trial court was under the impression that "weeks" had elapsed between the last day that Fanguy worked aboard the barge and the date that he was injured, the plaintiff testified that his last day on the job site was July 16, 1986, and that he was injured on July 22, 1986.
[6] Because of our holding on this issue, we do not address the argument by North Star and Eirich regarding Louisiana compensation law and exclusivity of remedies, which is also premised on a finding of an employer/employee relationship.

Likewise, we need not address the remedies that would have been available to plaintiffs under Louisiana tort law [see, Fonseca v. Marlin Marine Corp., 410 So.2d 674 (La.1981)]; since plaintiffs chose to bring this action under general maritime law and 33 U.S.C.A. § 905(b), any such discussion would be dicta herein.
[7] These nine factors are: (1) who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation; (2) whose work is being performed; (3) was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer; (4) did the employee acquiesce in the new work situation; (5) did the original employer terminate his relationship with the employee; (6) who furnished tools and place for performance; (7) was the new employment over a considerable length of time; (8) who had the right to discharge the employee; and (9) who had the obligation to pay the employee.
[8] In Dobson, the Supreme Court relied upon both the "Learned Hand test" for determining whether a risk is unreasonable and the list of factors contained in the Uniform Comparative Fault Act in its comment to § 2: (1) whether the conduct was mere inadvertence or engaged in with an awareness of the danger involved, (2) the magnitude of the risk created by the conduct, including the number of persons endangered and the potential seriousness of the injury, (3) the significance of what the actor was seeking to attain by his conduct, (4) the actor's superior or inferior capacities, and (5) the particular circumstances, such as the existence of an emergency requiring a hasty decision. 567 So.2d at 575.
[9] Plaintiff's expert economist estimated his future loss of earnings at $290,812.92, assuming that Mr. Fanguy would be totally and permanently disabled, and estimated his past loss of earnings at $23,528.28 as of March 17, 1988. Since the trial judge awarded a total of $260,000.00 for past and future loss of earnings, it is evident that the figures offered on plaintiff's behalf were adjusted by the court.
[10] Appellants also argue that the amounts awarded to plaintiff should have been discounted back to the date of his injury, rather than the date of trial. We find this argument unpersuasive, since the whole purpose of discounting a future award is to allow for the difference in value of money received in the present for a future loss which has not yet accrued. Plaintiff's losses from the date of injury up through the date of trial are not future losses, and therefore should not be discounted.
[11] Appellants cite Tate v. Charles Aguillard Insurance and Real Estate, Inc., 494 So.2d 1240 (La.App. 3rd Cir.1986), affirmed 508 So.2d 1371 (La.1987), and Thomas v. Life Ins. Co. of Georgia, 219 La. 1099, 55 So.2d 705 (1951) to support their argument. These cases are not on point with the situation herein, where a party is led to or allowed to believe coverage already exists by an agent and performs to its detriment, based on that belief.